695 A.2d 740

RICARDO SAEZ AND SOGNIA SAEZ, PLAINTIFFS–RESPON-DENTS, v. S & S CORRUGATED PAPER MACHINERY CO., INC., THE CGS GROUP, INC.,[1] DEFENDANTS,CORRUGATED GEAR & SPROCKET INC., AND CORRFLEX INC., DEFEN-DANTS–APPELLANTS.

RICARDO SAEZ AND SOGNIA SAEZ, PLAINTIFFS–RESPON-DENTS, v. PRIME TECHNOLOGY, INC., TECHNOLOGY LI-CENSING ASSOCIATES, INC.[2] AND CORRUGATED PAPER & MACHINERY, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued May 19, 1997—Decided June 27, 1997.

---

[1] Although these parties are listed in the caption, S & S is no longer a viable corporation, as it apparently was dissolved after being discharged in bankruptcy in 1985. No party appeals the grant of summary judgment dismissing plaintiffs' claims against The CGS Group, Inc.

546

---

Although this party is listed as "Technology Licensing Association" on an earlier caption, it identifies itself in its papers as "Technology Licensing Associates, Inc."

Before Judges DREIER, D'ANNUNZIO and VILLANUEVA.

*Martha D. Lynes* argued the cause for appellants Corrugated Gear & Sprocket, Inc., and Corrflex Inc. (*Elliot N. Fabricant*, attorney; *Ms. Lynes*, on the brief).

*Craig W. Miller* argued the cause for appellants Prime Technology, Inc., Corrugated Paper Machinery Corporation and Technology Licensing Associates, Inc., f/n/a S & S Licensing Company, Inc. (*Gallo, Geffner, Fenster*, attorneys; *Mr. Miller*, on the brief).

*Gerald H. Baker* argued the cause for respondents Ricardo Saez and Sognia Saez (*Baker, Garber, Duffy & Pedersen*, attorneys; *Mr. Baker*, on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendants Corrugated Gear & Sprocket, Inc. and Corrflex, Inc. (hereinafter collectively called Corrflex), and defendants Prime Technology, Inc., Corrugated Paper Machinery Corp., and Technology Licensing Associates, Inc. (hereinafter collectively

called Prime), appeal by leave granted from the denial of their motions for summary judgment in this successor liability action. We have consolidated the appeals of Corrflex and Prime for the purpose of this opinion.

All of these defendants, as well as others for which summary judgment was granted, are apparently owned or controlled by three individuals, including Prime's president, Michael Clary (hereinafter referred to collectively as "Clary"), or just by Clary himself. Corrflex was the purchaser, through other Clary corporations, of the parts inventory, plans and shop drawings for the parts incorporated in a flexofolder gluer machine manufactured for many years by the now-bankrupt S & S Corrugated Paper Machinery Company (hereinafter S & S). Prime obtained a licensing agreement to manufacture and market S & S equipment, including the flexofolder gluer, as well as the right to use the S & S technology in doing so, as will be explained in more detail.

The trial judge made factual findings at the summary judgment motion that are undisputed by the parties. We summarize these findings here to show the intricacy of the transactions that resulted in the eventual transfer of the technology. Plaintiff Ricardo Saez was injured in 1992 while operating a 1967 model 2LM flexofolder gluer machine manufactured by S & S.[3] The term "flexofolder gluer" is a generic one describing a manner of processing boxes from a flat corrugated cardboard blank to a finished glued box. Plaintiff claims the machine was defective.

In 1985, S & S filed for bankruptcy under Chapter Eleven of the Bankruptcy Code, later converting that filing to one under Chapter Seven of the Code. The company's secured creditors received and then sold all of the company's assets in which they previously held security interests. In April 1986, defendant Johnson Machine Company (later granted summary judgment) purchased all of the parts inventory and intellectual property rights of S & S.

---

[3] Sognia Saez, Ricardo Saez' wife, is an additional plaintiff asserting a per quod claim.

However, Johnson Machine did not purchase any machinery or equipment belonging to S & S.

Ten days after making this purchase, Johnson Machine assigned the intellectual property rights of S & S to two companies, S & S Licensing Company, which later changed its name to Technology Licensing Associates, and Corrugated Paper Machinery Company, both controlled by Clary.

Johnson Machine transferred to Corrugated Paper Machinery Company all intellectual property associated with the original components to construct complete machines. Because of this transfer, Corrugated Paper Machinery Company alone had the right to manufacture new machines of the S & S line.

The assignment by Johnson to S & S Licensing was for all of the intellectual property rights in S & S (including, but not limited to, trademarks, trade names, service marks, blueprints, drawings, records, and customer lists) associated with spare parts, as well as the exclusive right to use the name S & S in connection with the sale of the spare parts. Thus S & S Licensing had the right to provide existing machines with S & S spare parts.

On the same day that S & S Licensing received the intellectual property rights for the spare parts, it in turn entered into a licensing agreement with defendants Corrflex and Corrugated Gear & Sprocket Company to manufacture and sell spare parts for all S & S machines. These two entities also acquired the right to use the S & S name in connection with the sale of spare parts. This agreement was in effect until September 1992, when it was renewed and expanded. Specifically, the license agreement provided that it was made because the licensees, Corrflex, Corrugated Gear & Sprocket, Inc. and Corrugated Roll Corporation "desire to use the [intellectual property formerly owned by S & S Corrugated Paper Machinery Co., Inc.] in connection with the business of marketing spare parts for machines manufactured by S & S." Furthermore:

> Licensor (S & S Licensing) hereby grants Corrflex the right, during the term of this agreement, to use the name "S & S" in the Territory in connection with sales from the Inventory pursuant to the Consignment Agreement.
>
> Licensor hereby grants Licensees the right, during the term of this agreement, to use the name "S & S" in the Territory in connection with the sale of Spare Parts pursuant to this agreement.

The spare parts licensing cost Clary $400,000 plus ten percent royalties of the net sales.

On February 18, 1987, Corrugated Paper Machinery Company entered into a licensing agreement with Prime for the right to manufacture and market certain S & S equipment, including the flexofolder gluer. At that time, Prime acquired all intellectual property rights, including patent rights and engineering know-how. Specifically, the agreement stated that it was entered into because "PRIME desires to obtain a license of such proprietary know-how and rights to manufacture, use and sell" equipment of the S & S Corrugated Paper Machinery Co., Inc. Furthermore:

> CPMC hereby grants to PRIME for the term of this Agreement the exclusive license to use, employ and sublicense PATENT RIGHTS and KNOW–HOW for manufacturing, using and selling the Equipment worldwide.

The technologies licensed were described as "certain drawings and technical data associated with the flexofolder gluer that Prime would utilize in developing its design to market a Prime flexofolder gluer." The license to sell the flexofolder gluer machine and to utilize the technology cost Clary $100,000 plus a five percent royalty of the sales price of the licensed equipment, not to exceed $100,000 per year. The total royalties were not to be in excess of $500,000.

Prime contends that it was prepared to manufacture a flexofolder gluer before this agreement, but in fact it did not begin manufacturing the machine until 1988. The flexofolder gluer manufactured by S & S was "the same kind of product" as that later manufactured by Prime. Although Prime started with the basic design of the S & S machine, it claims the design was updated from what was called an "obsolete design."

Although these underlying facts are subject to only minor dispute, the application of *R.* 4:46–2 in *Brill v. Guardian Life*

*Insurance Co.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995), does not necessarily dictate that the trial judge must have granted summary judgment to one of the parties. In this case of successor liability, the ultimate issue is whether either Corrflex, Prime, or both are liable on the basis of having continued the S & S product line, a theory of liability defined in *Ramirez v. Amsted Industries, Inc.,* 86 *N.J.* 332, 431 *A.*2d 811 (1981) (relying upon *Ray v. Alad Corp.,* 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 560 *P.*2d 3 (1977)). *See also Nieves v. Bruno Sherman Corp.,* 86 *N.J.* 361, 431 *A.*2d 826 (1981).

The continuation of the product line test, defined in *Ramirez,* presents a mixed question of law and fact to a trial judge, and if the factual component of the issue is subject to a bona fide issue of material fact, the resolution of the question must await a trial. Only if "there exists a single, unavoidable resolution of the alleged disputed issue of fact, [should] that issue ... be considered insufficient to constitute a 'genuine' issue of material fact for the purposes of *Rule* 4:46–2." *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. A trial judge must grant summary judgment only "when the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Ibid.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 252, 106 *S.Ct.* 2505, 2511, 91 *L.Ed.*2d 202, 214 (1986)). We, as an appellate court, also apply these standards. *Antheunisse v. Tiffany & Co.,* 229 *N.J.Super.* 399, 402, 551 *A.*2d 1006 (App.Div. 1988), *certif. denied,* 115 *N.J.* 59, 556 *A.*2d 1206 (1989).

We note at the outset that S & S's bankruptcy in 1985 has no effect on the case before us. The assets or intellectual property rights in issue here were transferred to S & S's secured creditors. Clary, through his various corporations, as noted earlier, purchased these assets from the creditors, whose title was not derived through a bankruptcy sale or decree. We therefore neither reach the issues treated in, nor express an opinion concerning the correctness of, *Wilkerson v. C.O. Porter Machinery Co.,* 237 *N.J.Super.* 282, 567 *A.*2d 598 (Law Div.1989) (Chapter Eleven proceeding), and *Goncalves v. Wire Technology & Machinery Co.,*

253 *N.J.Super.* 327, 601 *A.*2d 780 (Law Div.1991) (Chapter Seven proceeding), both of which held that the *Ramirez* successor liability doctrine was not affected by a transfer through the bankruptcy process.

## I.

■ Plaintiff claims that Corrflex, as the purchaser of the intellectual property rights for S & S's spare parts and as the holder of a licensing agreement to manufacture and sell spare parts for all S & S machines, should be responsible as a successor to S & S for a product defect in the machines manufactured by S & S decades earlier. According to plaintiff, the parts manufacturer has continued the product line. Plaintiff argues that but for the availability of such spare parts, the defective machines would not be operational. While we might question this syllogism, since machine shops frequently fabricate spare parts for out-dated machines through the use of reverse engineering, we must further test the logic of plaintiff's proposition.

First, there is no question that Corrflex uses the S & S name. Its promotional literature, included in the appendix, indicates that it holds itself out as the purveyor of S & S spare parts. One advertisement reads in part: "CORRFLEX provides genuine S & S parts and expertise. Keep your S & S machines running like new with genuine S & S parts." (The underlined material is in triple size bold print). The advertisement states that S & S machines can continue to run with "genuine S & S parts." "Former S & S employees with an intimate knowledge of S & S machinery are on hand to answer questions and take your orders." There is a picture in the advertisement of a die labeled "one of the many original S & S dies used by Corrflex to make authentic S & S parts." And there is a large seal in the advertisement which is similar to the S & S logo. There is therefore no question that Corrflex has traded on the S & S name.

However, it is also clear that nowhere in any of the advertisements did Corrflex claim to manufacture a flexofolder gluer.

Plaintiff has never claimed that the parts supplier successor should be liable for his injury because Corrflex's spare parts were defective. Plaintiff's claim is only that Corrflex kept the machines running. But so did the former S & S employees that worked with Corrflex and serviced the machines; so did the utilities that supplied power to S & S and continued to supply power to Corrflex; and so did other employees, outside repair people, vendors and a myriad of other individuals and corporations that are needed to keep any ongoing concern operating.

If an outside vendor had been retained to manufacture spare parts for S & S while it was an operating company and at that time took out advertisements identical to those now used by Corrflex, an employee injured by a flexofolder gluer would have had no right to recover from the parts manufacturer unless the individual part was defective or the manufacturer participated in the assembling of the final product and failed to give appropriate warnings. *See Zaza v. Marquess & Nell, Inc.*, 144 *N.J.* 34, 50–65, 675 *A*.2d 620 (1996). If such a parts manufacturer was not liable before the transfer of the S & S technology, we see no reason why the fact of the transfer would suddenly impose liability on the original parts manufacturer. The same should be true when, as here, a new manufacturer has purchased the right to make spare parts. The *Ramirez* principle of successor liability does not impose responsibility based on incidental use of a predecessor's name or for fostering the continued use of the product.

We therefore determine that the trial judge incorrectly denied summary judgment to Corrugated Gear & Sprocket, Inc. and Corrflex, Inc.

## II.

We next turn to a different application of the *Ramirez* principles. Prime obtained the exclusive right to manufacture and market the flexofolder gluer. It obtained all intellectual property rights, patent rights, and engineering know-how, and the right to use, employ or sublicense that information. In effect, as to the

marketing of the S & S flexofolder gluer, it had the right to put on the market the very machine that injured plaintiff. But it did not do so. According to Prime, as was carefully explained at oral argument, it chose only to examine the property that it had obtained and make some modifications in the printing end of its own incipient flexofolder gluer, but to make no other use of its expensive purchase. Prime argues that its purchase of the technology and its right to use the S & S process should not be equated with the actual use of the process. It therefore argues that it has not continued the S & S product line because it intended to manufacture a flexofolder gluer before it purchased this technology and in no way adapted its process to mirror that of S & S, at least in the areas where plaintiff was injured.

As we stated earlier, however, this issue gives rise to a mixed question of law and fact. Prime's advertisements, as opposed to the Corrflex advertisements, do not trade on the S & S name. Yet, in Clary's deposition, he acknowledged that at least one trade journal carried extensive claims by him personally, as the President of Prime, that Prime had purchased the S & S know-how. In the article, appearing in *International Paperboard Industry*, Clary states that Prime had purchased the S & S updated technology and that "the S & S flexo delivery section was the most consistent performer available for all conditions." The article also states under a bold type heading "Purchase of S & S Assets," the following:

> In 1986 Prime purchased the intellectual assets of S & S. According to Mr. Clary, "They had been an industry leader with some very good products. The flexo enjoyed the reputation of being the workhorse of the industry and was the productivity leader for many years." Prime set out on a market research programme to determine how best to proceed with the primary product they had acquired—the inline flexofolder gluer. Managing Director Ted Hartka states: "We had many intuitive feelings on what to do . . . the [S & S] flexo had many fine features that made it the leader it was. We wanted to be sure not to change those features, but to apply current technology to the areas that needed attention. We quickly saw a consensus among users that their controls and electronics should be a major focus."

Statements such as these raise factual questions whether Prime in fact continued S & S's product line and whether Prime in fact

held itself out to the industry as doing so. Under the principles of *Brill*, the trial judge properly denied summary judgment to Prime.

## III.

We foresee that at a trial a jury might find that the product line was not continued, but that Prime had the right to do so, and by the purchase of the technology, Prime had effectively eliminated a competitor. In *Pacius v. Thermtroll Corp.*, 259 *N.J.Super.* 51, 611 *A.*2d 153 (Law Div.1992), the judge adopted a more expansive view of successor liability, extending the doctrine well beyond the continuation of the product line. *Pacius* states:

> The Court holdings were public policy determinations to afford a remedy to an injured person who would otherwise be remediless. The cases also make it clear that the justification for the imposition of liability is the benefit the successor company receives when it acquires the assets of the predecessor. It is the acquisition of the assets which is determinative of liability not the fact that the product line is continued by the successor. Since the purchasing company benefits from the acquisition of the assets of the predecessor, it should properly be saddled with its burdens. Any other conclusion would make little sense.
>
> . . . .
>
> Although Packaging did not continue the product line, it did continue the use of its predecessor's name, thereby exploiting Thermtroll's good will. It also utilized Thermtroll's blueprints. Most importantly, it eliminated a competitor. Surely, these were substantial benefits derived by Packaging which fairly justify the imposition of liability upon it. If we consider that the premise for imposing liability upon a successor corporation is to afford an effective remedy to a plaintiff who may otherwise be left remediless, then one must conclude that any benefit that the successor obtains from the acquisition of the assets of its predecessor should be sufficient to effectuate that proposition.
>
> [*Id.* at 57, 59, 611 *A.*2d 153].

New Jersey is one of the "small minority of courts" to follow the product line theory for successor liability. *Restatement (Third) of Torts: Products Liability* § 12 comment a (Proposed Final Draft, April 1, 1997) (approved by the American Law Institute May 20, 1997). The New Jersey rule is strongly criticized in the Restatement. The Reporters note that the reasoning behind the product line theory "has proven unpersuasive to a substantial majority of courts that have considered the issue." *Ibid.* This extension

in the judgment of most courts, [would] be unfair and socially wasteful. Post-transfer plaintiffs harmed by pre-transfer defects have a right to expect that a transfer of assets will not be allowed to prejudice financially their chances of satisfying a judgment; they have no legitimate claim that the transfer should increase those chances over what they would have been if no transfer had occurred. In the likely event that the successor is financially stronger than the predecessor, imposing a broader liability for pre-transfer product defects would unjustifiably increase the funds available to those injured by such defects compared with what would have been available to them if no transfer had taken place.

[*Ibid.*]

The Reporters engage in an extensive discussion of the negative financial aspects of the product line successor liability rule. In the Reporters' notes to § 12, they acknowledge the cases in New Jersey, California, Pennsylvania and Washington supporting the product line basis for liability, and also note that in Washington "the continued product line must be the one that harms the plaintiff." *Id.* at comment c (citing *Fox v. Sunmaster Products, Inc.*, 63 *Wash.App.* 561, 821 *P.*2d 502 (1991)). Likewise, they note that the exception "is still theoretically viable in Pennsylvania," but cannot be invoked fully "if a plaintiff has a possible remedy against the predecessor." *Ibid.* (citing *LaFountain v. Webb Industries Corp.*, 951 *F.*2d 544 (3d Cir.1991)). The Reporters then discuss in detail *Pacius v. Thermtroll Corp., supra,* as elucidating "a very liberal test for corporate successor liability, premised on maximizing recovery as opposed to evidence of express agreement to be liable or substantial deprivation of remedies for plaintiffs against the predecessor corporation." *Ibid.* The Reporters then quote the following portion of *Pacius,* actually an internal quotation, as establishing New Jersey policy:

Fundamental fairness has been sought through a balancing of the rights of the injured party against the rights of those engaged in business, including the latter's reasonable commercial expectations. Placing the economic burden of injuries on those best able to pay for those costs while permitting the transfer of that burden to those most culpable is consistent with the equitable considerations inherent in the resolution of the difficult problems which have been judicially posed. The thrust from our high court as a matter of first priority has been to maximize recovery for the victim.

[*Ibid.* (quoting *Pacius, supra,* 259 *N.J.Super.* at 58, 611 *A.*2d 153) (citation omitted).]

This quotation is not an expression of the New Jersey Supreme Court, but rather is a summary of the more expansive California rule expressed in *Rawlings v. DM Oliver Inc.*, 97 *Cal.App.*3d 890, 159 *Cal.Rptr.* 119, 124 (1979).

We question whether, even considering the liberal product line basis of liability established in *Ramirez*, our Supreme Court would adopt as blatant a "deep pocket" theory of recovery as is described in *Rawlings*, and is attributed to New Jersey by the Restatement through this quotation from *Rawlings* in *Pacius*. As we have noted earlier, under *Ramirez* and *Nieves* there must be a continued manufacture of the product line wherein the purchaser utilizes the predecessor's name and good will. As stated in *Ramirez*:

> Under today's determination the [traditional] approach is no longer the standard to be applied in determining the liability of a successor corporation for injuries caused by a defective product manufactured and placed in the stream of commerce by a predecessor. Rather, we hold that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by *extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.*
>
> [86 *N.J.* at 358, 431 *A.*2d 811 (emphasis added).]

In *Pacius*, the product line was not continued, but the purchaser did exploit the predecessor's good will. 259 *N.J.Super.* at 59, 611 *A.*2d 153. *Ramirez*, however, requires that such exploitation be a consequence of the continued manufacture of the predecessor's product.

The issue for the trial judge on remand is whether all the required elements of *Ramirez* are present here, not whether there was "any benefit that the successor obtain[ed] from the acquisition of the assets of its predecessor" or if the successor eliminated a competitor. *Pacius, supra*, 259 *N.J.Super.* at 59, 611 *A.*2d 153.

So broad a test would be no test at all. As noted earlier, there are sufficient claims of continuity of the product line by Prime and its trading on S & S's name to defeat Prime's summary judgment motion, but the issues are by no means definitively proven against Prime.

We reverse the denial of summary judgment as to Corrugated Gear & Sprocket, Inc. and Corrflex, Inc., and remand for the entry of an order of dismissal. The matter is remanded to the Law Division for further proceedings concerning Prime Technology, Inc., Corrugated Paper & Machinery Corp., and Technology Licensing Associates, Inc., consistent with this opinion.