725 A.2d 697 (1999)
319 N.J. Super. 386
Casmir POTWORA, an incompetent, by his guardian, Ann Marie GRAY, Plaintiff,
v.
John A. GRIP, Jr., and Mary Jean Clancy-Cherry, Defendants.
Casmir Potwora, an incompetent, by his guardian, Ann Marie Gray, Plaintiff/Appellant,
v.
Land Tool Co., Inc., Elvert H. Land, Jr., Kosco Harley Davidson and Vector Sports, Defendants/Respondents/Third-Party Plaintiffs, and
Lear Siegler, Defendant/Respondent, and
Royal Industries and Franchini Harley Davidson, Defendants,
v.
Mary Jean Clancy-Cherry, Third-Party Defendant.
John A. Grip, Jr., Third-Party Defendant/ Fourth-Party Plaintiff,
v.
Mary Jean Clancy-Cherry, Fourth-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted January 21, 1999.
Decided March 18, 1999.
*698 Kenneth D. Iulo, Passiac, for plaintiff/appellant (August R. Soltis, on the brief).
Pepper Hamilton, Cherry Hill, for respondent Lear Siegler (Nicholas M. Kouletsis, on the brief).
Vector Sports, respondent pro se, did not file a brief.
Before Judges WALLACE, NEWMAN and FALL.
The opinion of the court was delivered by WALLACE, J.A.D.
Plaintiff Casmir Potwora sustained severe head injuries when his motorcycle ran into the back of an automobile driven by defendant John Grip. Plaintiff's motorcycle helmet shattered upon impact. Plaintiff, by his guardian, Ann Marie Gray, brought this products liability suit against Land Tool Co., Inc. (Land Tool), the manufacturer of the helmet; Elvert H. Land, Jr., the owner of Land Tool; Royal Industries, Inc. (Royal), the manufacturer of a helmet similar to plaintiff's helmet; Lear Siegler, Diversified Holdings Corporation (Lear Siegler), the purchaser of Royal; Vector Sports, a manufacturer of motorcycle helmets owned by Elvert Land's son; Kosco Harley Davidson (Kosco), the seller of the helmet; and Franchini Harley Davidson (Franchini), the purchaser of Kosco.
Plaintiff appeals from separate orders of the Law Division granting summary judgment in favor of Lear Siegler and Vector Sports. All other defendants were either voluntarily dismissed or were granted summary judgment. Plaintiff contends the motion judge erred in granting the summary judgment motion of Lear Siegler because (1) the merger of Lear Siegler with Royal makes Lear Siegler liable for all of the liabilities of Royal by operation of the statutory *699 merger laws and the agreement to assume all liabilities of Royal; (2) Royal sold helmet designs, specifications and manufacturing "know how" to Land Tool, and Royal's attempt to limit liability to helmets manufactured before 1975 was void as against public policy; (3) Lear Siegler, as successor-in-interest to all of the liabilities of Royal, is subject to liability on a design defect claim under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11, and under a common-law negligence theory; and (4) Lear Siegler, as successor-in-interest to all the liabilities of Royal, is subject to liability for a design defect claim since the design of the RG-9 and RG-4 helmets are identical. With regard to Vector Sports, plaintiff contends that Vector Sports is subject to successor liability under the product-line and continuation of enterprise theories of liability. We disagree and affirm.

I

A. The Accident and Design of Helmet
On October 6, 1990, plaintiff was injured when his motorcycle struck the rear of the car driven by Grip. Plaintiff was thrown from his motorcycle and his helmet shattered upon impact with the street. Plaintiff was wearing an RG-4 helmet manufactured by Land Tool. He sustained serious head injuries which left him comatose.
On October 5, 1992, plaintiff filed a complaint against various defendants. He claimed that the RG-4 helmet (RG stands for Royal-Grant) he wore was essentially the same as the RG-9 helmet manufactured first by defendant Royal and later by Land Tool. A motorcycle helmet consists of two basic components, the outer rigid shell and an inner shock-absorbing liner. The liner compresses upon impact and serves to absorb the shock. The outer shell resists penetration of sharp objects and distributes the impact over a large area of the liner. The RG-9 helmet was designed by John King, the chief engineer of Grant Industries, a division of Royal. Royal began to manufacture the RG-9 in 1972.

B. Relationship Between Land Tool and Royal
Land Tool was formed on February 26, 1975, by Elvert Land. He and his wife, Peggy Land and their son, Joseph, were the directors. Elvert was chairman of the board and owned 90% of the stock while Joseph was president and owned 10% of the stock.
Elvert testified that the RG-9 came to his attention in 1973 when he heard that the Department of Transportation (DOT) had tested all current motorcycle helmets and the RG-9 was the only one that passed. In August 1975, Land Tool purchased Grant Industries from Royal and acquired the RG-9 mold. The agreement provided that Royal retain liability only for those products manufactured by Grant Industries prior to the sale in August 1975. The agreement also allowed Land Tool to continue use of the RG designation for helmets. After this purchase, Land Tool moved all of the equipment from Grant's facility in Los Angeles, California, to Land Tool's facility in Wichita, Kansas.

C. The Design of the RG-4
The RG-4 design was developed in 1976 by Land Tool. The Grant Division helmet line included a mold for a "shorty" helmet. Rather than use that mold, Elvert designed his own known as the RG-4. Elvert testified that he used the RG-9 shell as a pattern for the RG-4 shell, trimming away the lower portion to create a shorty design. The shells of both helmets were made of the same material, polycarbonate, in approximately the same thickness. Once the RG helmet shell was trimmed, a new mold was made. Land Tool also trimmed the polystyrene shock lines of the RG-9 so it would fit the new shorter RG-4 shell. Except for the length, the liners of the RG-9 and RG-4 were interchangeable. The chin strap of the RG-9 was redesigned to create a V-shaped dual strap to stabilize the shorter helmet. The chin strap of the RG-9 was redesigned to have a rather wide spread attachment point to stabilize the shorter helmet. Land Tool began manufacturing the RG-4 helmet in 1976 and continued until the company was shut down in January 1988. In total, Land Tool manufactured about 50,000 RG-4 helmets, including the helmet worn by plaintiff.

D. Relationship Between Lear Siegler and Royal
In 1977, Lear Siegler, Inc., a predecessor in interest to Lear Siegler, acquired the remainder *700 of Royal which no longer had any helmet business. Lear Siegler assumed liability only for those helmets manufactured by Royal's former Grant Division before August 1975. In 1979, Royal was merged into Lear Siegler. The certificate of merger stated that Lear Siegler "shall succeed to and possess all the properties, rights, privileges, immunities, powers and purposes of Royal Industries, Inc. and shall assume all of the liabilities and obligations of Royal Industries, Inc."

E. Relationships Between Land Tool and Vector Sports
In the fall of 1986, Joseph resigned as president of Land Tool in order to start his own company, Norstar Recreation Products (Norstar) in Calgary, Alberta. Norstar manufactured snowmobile and motorcycle helmets. Joseph was the sole shareholder and president of Norstar and received no money from his father or from Land Tool for the start-up of Norstar. Joseph testified that he founded Norstar because he wanted to start a business on his own. He saw a business opportunity for making helmets in Canada after a dramatic change in the exchange rate made it impractical for United States companies to sell helmets in the Canadian market. Norstar began manufacturing helmets in early 1987. During the first two years of its operation, Norstar purchased some components for motorcycle helmets from Land Tool, such as shells, liners, chin straps and comfort pads. Norstar also purchased helmet molds of several other helmet manufacturers.
Joseph also formed Cheyenne Western Plastic, Limited. (Cheyenne). Cheyenne produced injection moldings for plastics, including component parts of motorcycle helmets such as molded shells and shields which it sold exclusively to Norstar.
After Land Tool closed in January 1988, Norstar leased Land Tool's assembly line and production equipment from Elvert, and Cheyenne leased its molds and presses from Elvert. Norstar manufactured the Mirage and the Mega I, II and III helmets, the same helmets manufactured by Land Tool, using molds obtained from Land Tool. The mold for the RG-9 had been scrapped because it was worn out before January 1988.
Sometime after January 1988, Elvert formed Land Tool Company, Limited (Land Limited), in Canada with Elvert and Joseph as officers. Land Limited was located half a block from Norstar. Norstar sold finished helmets to Land Limited, which marketed them in the United States to some of Land Tool's old accounts.
Norstar declared bankruptcy and closed operations in 1988. Elvert then purchased Vector Ballistics Research and began manufacturing and selling motorcycle helmets. Joseph was not actively involved in this business but may have been on the board of directors. Vector Ballistics leased equipment from Elvert that had originally been used by Land Tool. Vector Ballistics manufactured the Mirage and Mega I, II and III helmet styles, the helmets previously manufactured by Land Tool until the Spring of 1991 when it was shut down by the Canadian Revenue. Land Limited also operated until the Spring of 1991.
Joseph organized Vector Sports in February 1991 in Fort Collins, Colorado. Joseph was president and owned 100% of the stock while Elvert was secretary. Vector Sports began manufacturing and marketing motorcycle helmets in early summer 1991. Initially, Joseph started the company using $1,000 of his own money. Elvert sold inventory and materials to Vector Sports, including shorty fabric liners. Elvert also leased equipment to Vector Sports for $5,000 per month pursuant to an agreement dated March 1, 1991. The equipment included production machinery, molds, tooling, and injection molding presses. Joseph admitted in his deposition testimony that many of the molds may have been originally used by Land Tool. On November 1, 1993, Elvert leased to Vector Sports three pieces of machine shop-type equipment for sixty months at the rate of $1,200 per month for a total of $72,000. Elvert testified he did not receive payment on this lease because Vector Sports did not have the money. Elvert leased other equipment to Vector Sports as well.
Vector Sports made various fiberglass helmets and polycarbonate helmets. Its VS-100 *701 was made with a modified Mega I mold and its VS-200 was made with a modified Mega II mold. The Mega I and II helmets were originally manufactured by Land Tool.
Many of the helmets Vector Sports manufactured in 1991 and 1992 were the same as models sold by Land Limited. By late spring 1992, Vector Sports had acquired its own logos and trade markings and began to brand products as Vector. These new Vector Sports helmets also contained design modifications, including changes to the lens mounting system and the addition of ventilation. Joseph testified that some of Vector Sports' customers may have also been customers of Land Tool.
Plaintiff's attorney bought a Vector Sports motorcycle "shorty" helmet model MH-13023 on May 4, 1995. In a certification, the attorney stated "it is apparent that the helmets [the RG-4 and the MH-13023] are virtually identical in design with very minor cosmetic differences." The shock liners were interchangeable between the newer model, the MH-13023, and the RG-4.

F. Expert Reports
Paul K. So, project manager with L.J. Broutman & Associates, opined that the RG-4 model was a cosmetically modified version of the RG-9 helmet line. The modification was made by removing small portions of the RG-9 shell and liner in the lower part of the helmet below the DOT impact zone. The shell of plaintiff's helmet shattered, which indicated that the shell "lacked ductility or toughness, and has poor impact resistance." The helmet was on plaintiff's head at the time of impact. In his opinion, the shell was defective at the time it was manufactured because the polycarbonate shell material was significantly weaker than required by industry standards, thereby rendering the RG-4 helmet inherently unsafe and dangerous to the user.
Igor L. Paul opined based on a reasonable degree of engineering and biomechanical probability, that the RG-4 helmet was the same design as the RG-9 helmet. He said that changes made by Land Tool in the helmet design were merely cosmetic. In reaching this conclusion, Paul relied on Elvert's answer to an interrogatory which stated that the RG-4 was merely a cosmetic modification of the RG-9 and that the shock attenuation characteristics were left unchanged. Paul opined that the design of the helmet was defective because the shell was made of polycarbonate material of inadequate design and thickness which would shatter during foreseeable accident impact conditions. Additionally, the polycarbonate material was inferior because it was recycled or otherwise degraded during the manufacturing process; this contributed to the failure of the shell.
Paul also opined that the polystyrene helmet liner was too rigid and of inadequate thickness to provide adequate protection. The liner did not crush from within so it did not attenuate the shock to plaintiff's head during the accident. In addition, Paul opined that plaintiff's coma was induced by the trauma to plaintiff's head underneath the helmet. Paul concluded that the RG-4 helmet and the RG-9 helmet line exposed users to hidden and unreasonable hazards of excessive and unnecessary serious injury, and thus, the RG-4 helmet was not fit for its intended purpose. Finally, Paul opined that a properly designed state-of-the-art helmet would have prevented plaintiff's brain trauma. At worst, he would have suffered a mild to moderate concussion and would have recovered with no permanent injury to his brain.

II
We turn now to plaintiff's contentions addressed to Lear Siegler. Plaintiff contends the trial judge erred in granting Lear Siegler summary judgment since it was the successor to Royal, which was the de facto designer of the RG-4 helmet plaintiff was wearing at the time of the accident. Plaintiff essentially makes a three-part argument. First, he argues there is a genuine issue of material fact as to whether the helmet he was wearing at the time of the accident, the RG-4, is so similar to the RG-9, designed by defendant Royal, that in fact Royal may be considered the designer of the RG-4. Second, assuming Royal is the designer of the RG-4, plaintiff argues that Royal is liable in products *702 liability or negligence for the injuries caused by plaintiff's helmet which was manufactured by Land Tool, Royal's successor. Finally, plaintiff argues that Lear Siegler is the successor to all of the liabilities of Royal.
A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Under the standard announced in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995),
a determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
Accordingly, "when the evidence `is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." Ibid. (citation omitted).
We need only address plaintiff's contention that Royal is responsible for the RG-4 helmet manufactured by Land Tool under either a products liability theory or a negligence theory. The product's liability theory advanced by plaintiff is novel. The issue is whether a manufacturer who designs a motorcycle helmet but later sells the manufacturing assets of its helmet division may still be held liable for injuries caused by a helmet manufactured by the successor corporation. This is different from successor liability developed by our Supreme Court in Ramirez v. Amsted Indus. Inc., 86 N.J. 332, 431 A.2d 811 (1981), and discussed most recently in Mettinger v. Globe Slicing Mach. Co., 153 N.J. 371, 709 A.2d 779 (1998). Ramirez, supra, 86 N.J. at 358, 431 A.2d 811, held that a company which purchases the manufacturing assets of another company and undertakes manufacturing the same product line is strictly liable in tort for injuries caused by defects in products in that line even if manufactured by the predecessor company. The question here is not the successor liability of Land Tool, but whether the selling company, Royal, and its successor, Lear Siegler, may be held liable for a product subsequently manufactured by the company which bought its manufacturing assets, Land Tool.
The New Jersey Products Liability Act (the Act), N.J.S.A. 2A:58C-1 to -11, provides:
A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: ... c. was designed in a defective manner.

[N.J.S.A. 2A:58C-2 (emphasis added).]
Here, Royal was neither a manufacturer or seller of plaintiff's helmet. At most it was a designer. Consequently, under the terms of the Act it would appear that Royal cannot be held strictly liable in tort. Nonetheless, "this [A]ct is not intended to codify all issues relating to products liability, but only to deal with matters that require clarification." N.J.S.A. 2A:58C-1. Thus, we must also examine the common law in order to understand the meaning of "manufacturer or seller" within the context of the Act.
The type of entities which may be held strictly liable beyond that of traditional manufacturers and sellers has been expanded. See Ramos v. Silent Hoist and Crane Co., 256 N.J.Super. 467, 474-75, 607 A.2d 667 (App.Div.1992). Our Supreme Court has upheld products liability actions against a builder and reconditioner of a machine (Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 451 A.2d 179 (1982)), a mass producer of houses (Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965)), and a lessor of trucks (Cintrone v. Hertz Truck Leasing & Rental Serv., 45 N.J. 434, 212 A.2d 769 (1965)). Further, successor corporations are responsible for damages caused by defects in products manufactured and distributed by predecessors. Ramirez v. Amsted Indus., Inc., supra, 86 N.J. at 332, 431 A.2d 811.
*703 In Michalko, supra, 91 N.J. at 390-91, 451 A.2d 179, Elastimold hired defendant, an independent contractor, to rebuild a transfer press according to Elastimold's design. The press injured plaintiff, an employee of Elastimold, due to a lack of safety devices. Ibid. The Court held defendant strictly liable even though it was not responsible for the design of the press since "[w]hat is important is that the defect did in fact exist when the product was distributed by and was under the control of the defendant." Id. at 396, 451 A.2d 179. The Court rejected defendant's argument that the rebuilt machine was unfinished at the time it left its hands and explained: "The general rule is that the manufacturer of a component part of a product may be held strictly liable for injuries caused by a defect in that part if the particular part did not undergo substantial change after leaving the manufacturer's hands." Id. at 399, 451 A.2d 179.
Here, unlike Michalko, the motorcycle helmet worn by plaintiff was never in the control of Royal, and Royal did not manufacture any component part of the helmet.
In Ramos v. Silent Hoist and Crane Co., supra, 256 N.J.Super. at 476-77, 607 A.2d 667, we found that defendant, an electrician, who installed and designed the electrical system and placement of switches to the capstan which injured plaintiff, was not the manufacturer or seller of the capstan. We reasoned that defendant had provided a design and installation service; had not sold or manufactured the capstan, nor had it provided a defective component part, in the sense of Michalko, supra. Thus, we held defendant was not strictly liable in tort. Nevertheless, we held defendant could be liable for negligently providing a service, that is, the design and installation of the electrical system. 256 N.J.Super. at 478, 607 A.2d 667.
Similarly here, the only connection Royal had with plaintiff's helmet is that it arguably was its original designer. Moreover, unlike in Ramos, Royal was no longer in the helmet business at the time the alleged defective helmet was manufactured and sold. Under these circumstances, Royal did not place the helmet within the stream of commerce and it was not the manufacturer or seller of the helmet. Consequently, Royal may not be liable under the Act.
Moreover, the policy considerations which weigh in favor of imposing liability on a successor corporation do not apply to a predecessor corporation. The Supreme Court in Ramirez, supra, 86 N.J. at 350-51, 431 A.2d 811, listed three justifications for imposing strict tort liability on a successor corporation. First, the imposition of successor corporation liability is consistent with the public policy of spreading risk to society at large for the cost of injuries from defective products. Id. at 350, 431 A.2d 811. The Court elaborated on this rationale in Nieves v. Bruno Sherman Corp., 86 N.J. 361, 369, 431 A.2d 826 (1981):
As stated in Ramirez, because the successor corporation acquired the resources that had previously been available to the original manufacturer for meeting its responsibilities to persons injured by defects in its line of products, the successor remains in a better position than the user of the product to bear accident avoidance costs.
In contrast, here, once Royal sold its manufacturing assets to Land Tool, it lost the ability to spread the risk of producing the product to the consumers of that product.
Second, the Court in Ramirez, supra, 86 N.J. at 350-51, 431 A.2d 811, reasoned that the plaintiff's remedy against the predecessor corporation was destroyed by the successor's purchase of the manufacturing assets. While this consideration is not applicable here, it is clear that Royal had no responsibility for the financial demise of Land Tool and the consequent destruction of plaintiff's remedy against Land Tool.
Third, the Court in Ramirez, supra, 86 N.J. at 352, 431 A.2d 811, justified imposing responsibility on a successor because it enjoys the benefit of the predecessor's "trade name, good will and the continuation of an established manufacturing enterprise." This policy consideration was short-lived here since Land Tool discontinued operations in 1988.
Further, there might be practical insurance ramifications to holding a predecessor company responsible for a product it no longer manufactured. There is little reason Royal *704 would maintain products liability insurance for a design defect in a helmet it has not manufactured for a considerable period of time. As we noted in Ramos, supra, 256 N.J.Super. at 477, 607 A.2d 667:
If this electrician had no product liability coverage, and there is no reason it would have such coverage, our defining its actions as the sale of a defective product could have been financially disastrous. The effect would be felt not just in this case, but throughout the service industries, affecting plumbers, carpenters, and other trades. The law should follow the reasonable expectations of the public concerning the ramifications of a party's actions.
In addition, under the circumstances of this case it would be a significant departure from current law to impose strict liability on Royal. An intermediate appellate court should "adhere to the existing law of the State and ... `any departure from it should be undertaken by the court of last resort, and not by the Appellate Division.'" Silagy v. State, 105 N.J.Super. 507, 510, 253 A.2d 478 (App.Div.), certif. denied, 54 N.J. 506, 257 A.2d 106 (1969) (quoting Casale v. Housing Auth. of Newark, 42 N.J.Super. 52, 62, 125 A.2d 895 (App.Div.1956)). "Generally, a new cause of action should be created by legislative enactment or by the Supreme Court rather than by an intermediate appellate court." Proske v. St. Barnabas Med. Ctr., 313 N.J.Super. 311, 316, 712 A.2d 1207 (App.Div.1998) (citations omitted).
Plaintiff argues, in the alternative, that Royal should be held responsible under a common law negligence theory. However, to permit recovery under a negligence theory runs contrary to the Act which defines a "product liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C-1(b)(3). Interpreting this section, we explained: "[I]t is clear that common-law actions for negligence or breach of warranties (except express warranties) are subsumed within the new statutory cause of action, if the claimant and harm also fall within the definitional limitations of section 1." Tirrell v. Navistar Int'l, Inc., 248 N.J.Super. 390, 398, 591 A.2d 643 (App.Div.) (footnote omitted), certif. denied, 126 N.J 390, 599 A.2d 166 (1991). Here, the claim falls within the ambit of the Act because plaintiff is claiming that a product caused him harm, that is, personal physical injury. See N.J.S.A. 2A:58C-1(b)(2) (" `Harm' means... (b) personal physical illness, injury or death....").
Plaintiff relies on Ramos, supra, 256 N.J.Super. at 467, 607 A.2d 667, in support of his argument that he may maintain a negligence action against Royal. In Ramos, supra, 256 N.J.Super. at 476-78, 607 A.2d 667, we concluded that defendant provided a service rather than a product, and thus plaintiff's claim against defendant was not "for harm caused by a product" within the meaning of the Act. N.J.S.A. 2A:58C-1(b)(3). Classifying defendant as a service provider took the cause of action outside the Act. In contrast, here, the harm plaintiff complains of was caused by a product, the helmet, and accordingly is covered by the Act.
As noted, Lear Siegler merged with Royal in 1979 and expressly assumed Royal's obligations. It is not disputed that Lear Siegler would be liable for any defective helmets actually manufactured by Royal. However, Royal was neither the manufacturer or the seller of plaintiff's motorcycle helmet and, therefore, is not strictly liable in tort for design defects in that helmet. Thus, Lear Siegler as the successor of Royal is not responsible for injury caused by helmets manufactured by Land Tool.
Plaintiff also contends that he created a genuine issue of material fact as to whether the RG-4 helmet worn by plaintiff is a copy of the RG-9 helmet designed by Royal. However, our conclusion that Royal and its successor, Lear Siegler, are not liable as the designer renders this issue moot.

III
We turn now to plaintiff's contentions that the judge improperly granted Vector Sports summary judgment because it was the successor corporation to Land Tool under *705 the product-line exception or the continuation of business theory.
The motion judge found Vector Sports had no successor liability for Land Tool because it did not manufacture helmets under Land Tool's name, did not take over Land Tool's operations, did not take advantage of any good will generated by Land Tool, did not "deal with the same people," did not copy the outward appearance of Land Tool helmets, and purchased assets from corporations other than Land Tool. We agree.
In general, a corporation that acquires all of the assets of another company by sale or other transfer is not liable for the debts and liabilities of the transferor when the provision of the purchase agreement indicate an intention to limit the purchaser's assumption of liability. McKee v. Harris-Seybold Co., 109 N.J.Super. 555, 561, 264 A.2d 98 (Law Div.1970), aff'd, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972). There are exceptions where: (1) the purchaser expressly or impliedly agrees to assume the liabilities; (2) the transaction amounted to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction was entered into fraudulently in order to escape liability for such obligations. Ibid.
At one time under traditional corporate law, a successor company was liable for the debts and liabilities of its predecessor in very limited circumstances. McKee v. Harris-Seybold Co., 109 N.J.Super. 555, 561, 264 A.2d 98 (Law Div.1970), aff'd, 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972). One of these circumstances is where the purchasing corporation merges the selling corporation into itself, and another is where the purchasing corporation is merely a continuation of the selling corporation. Ibid.
In Ramirez v. Amsted Indus., Inc., supra, 86 N.J. at 347-48, 431 A.2d 811, our Supreme Court largely abandoned this traditional rule in products liability cases. The Court instructed that the traditional analysis of corporate successor liability was developed "not in response to the interests of parties to products liability actions, but rather to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor." Id. at 341, 431 A.2d 811. The Court instructed that in products liability cases "the focus ... should be on the successor's continuation of the actual manufacturing operation and not on commonality of ownership and management between the predecessor's and successor's corporate entities...." Id. at 347, 431 A.2d 811. Accordingly, the Court adopted the products line analysis, holding:
where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

[Id. at 358, 431 A.2d 811.]
The Court described the policy considerations justifying this conclusion:
"(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business."
[Id. at 349, 431 A.2d 811 (quoting Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)).]
In the companion case to Ramirez, Nieves v. Bruno Sherman Corp., 86 N.J. 361, 364-65, 431 A.2d 826 (1981), the Court held that product-line liability could also be imposed on an intermediate successor corporation which had acquired all the manufacturing assets of the original manufacturer, but had since sold those assets to a subsequent successor and *706 discontinued the product line which caused injury.
In Bussell v. DeWalt Prod. Corp., 259 N.J.Super. 499, 502, 516, 614 A.2d 622 (App. Div.1992), certif. denied, 133 N.J. 431, 627 A.2d 1137 (1993), we found Black and Decker liable for the 1981 amputation of plaintiff's thumb and three fingers caused by a radial arm saw manufactured by a predecessor company, DeWalt Product Corporation, (De-Walt). Ibid. DeWalt, which manufactured the radial arm saw in 1941, was bought in 1958 by AMF which acquired all the assets, including those relating to the radial arm saw. Ibid. AMF continued to manufacture the radial arm saw at the same premises as DeWalt. Ibid. In 1960, Black and Decker acquired the portion of AMF which manufactured the radial arm saw and Black and Decker continued to manufacture them under the DeWalt name at the same premises. Ibid. We found it insignificant that Black and Decker had not received all the manufacturing assets from AMF that AMF had received from DeWalt. Id. at 517, 614 A.2d 622. It was enough that Black and Decker received all the assets and information that related to the manufacture of the DeWalt radial arm saw. Ibid. We also found it unimportant that the radial arm saw manufactured by Black and Decker was updated with technological advances and thus was not the exact same one manufactured by DeWalt. Id. at 518, 614 A.2d 622. While the successor must undertake essentially the same manufacturing operation, the operation need not be identical. Ibid. Nor did it matter that AMF, not Black and Decker, acquired all of the assets of DeWalt; indeed, we noted that Black and Decker was in a better position to spread the risk as it still manufactured the radial arm saw, whereas AMF did not. Id. at 520, 614 A.2d 622.
Recently, in Saez v. S & S Corrugated Paper Mach. Co., 302 N.J.Super. 545, 552-53, 695 A.2d 740 (App.Div.1997), we held the corporation that purchased the rights to manufacture spare parts for the flexofolder gluer machine which injured plaintiff could not be held liable for plaintiff's injuries. However, we also noted there was a genuine issue, so that plaintiff could survive the summary judgment motion, as to whether the corporation which bought the rights to manufacture the machine could be liable under a product-line succession theory. Id. at 553-55, 695 A.2d 740. We explained: "The continuation of the product-line test, defined in Ramirez, presents a mixed question of law and fact to a trial judge, and if the factual component of the issue is subject to a bona fide issue of material fact, the resolution of the question must await a trial." 302 N.J.Super. at 551, 695 A.2d 740.
More recently, in Lefever v. Lull Indus., Inc., 311 N.J.Super. 1, 7-9, 709 A.2d 253 (App.Div.), certif. granted, 156 N.J. 387, 718 A.2d 1217 (1998), we held the bankruptcy of an intermediate corporation did not destroy plaintiff's remedy against the current manufacturer, as the product-line successor. We noted the current manufacturer was the product-line successor because it "utilizes the same plant, machinery, employee group, trade name and goodwill...." 311 N.J.Super. at 7, 709 A.2d 253.
Applying these principles here, Land Tool filed bankruptcy in 1988 and ceased operations. At that time it leased its assembly line, production equipment, molds, and presses to Norstar and Cheyenne, companies operated in Canada. Subsequently, Norstar manufactured the Mega I, II, and III helmets, the same helmets manufactured by Land Tool. Norstar did not manufacture the RG-9 helmet because that mold was scrapped as it was worn out before Norstar leased the equipment from Land Tool. The record is silent whether Norstar continued to manufacture the RG-4 helmet. Norstar and Cheyenne ultimately closed in 1988.
Afterwards, Vector Ballistics leased equipment originally used by Land Tool, and manufactured the Mirage, and Mega I, II, and III helmets, all of which had been previously manufactured by Land Tool. Vector Ballistics operated until the Spring of 1991 when it was shut down by the Canadian Revenue.
In early 1991, Vector Sports was formed, opening a plant in Fort Collins, Colorado. Vector Sports leased some equipment from Elvert, the owner of Land Tool. Many of the helmets Vector Sports manufactured in 1991 and 1992 were originally manufactured by *707 Land Tool. But in the late spring of 1992, Vector Sports acquired its own logos and trade marks and began to brand products as Vector. These new Vector helmets also contained design modifications, including changes to the lens mounting system and the addition of ventilation.
Plaintiff bears the burden of establishing that a party is a successor corporation within the meaning of Ramirez, supra, 86 N.J. at 332, 431 A.2d 811. Wilkerson v. C.O. Porter Mach Co., 237 N.J.Super. 282, 303, 567 A.2d 598 (Law Div.1989). In our view, plaintiff failed to present competent evidence that Vector Sports continued to manufacture the RG-4 helmet and thus undertook "essentially the same manufacturing operation as the selling corporation." Ramirez, supra, 86 N.J. at 347-48, 431 A.2d 811. The proofs merely demonstrate that Vector Sports continued manufacturing many of the same helmets as Land Tool but there is no meaningful evidence that it continued the RG-4 line. While plaintiff's attorney's certified that the RG-4 looks the same as the MH-13023 manufactured by Vector Sports, this is mere speculation. None of the experts reached this conclusion. Expert testimony is needed in this area. Scanlon v. General Motors Corp., 65 N.J. 582, 591-94, 326 A.2d 673 (1974).
Plaintiff asserts that it is indisputable that the RG-4 mold made its way from Land Tool to the Vector Sports facility and cites the leasing agreement between Elvert and Vector Sports in support of this statement. This agreement lists a number of injection molders in the description of equipment leased, but it is unclear whether any of these molds are for the RG-4 helmet or were originally used by Land Tool. In short, giving plaintiff the benefit of all inferences, he failed to establish that Vector Sports is the product-line successor to Land Tool within the meaning of Ramirez.
Plaintiff also claims Vector Sports is the successor of Land Tool when measured by the continuation of business theory of traditional corporate law. This approach was outlined in McKee v. Harris-Seybold Co., supra, 109 N.J.Super. at 561, 264 A.2d 98. In McKee, the court explained that a purchasing corporation would be considered the continuation of the selling corporation only under very limited circumstances. Id. at 567-71, 264 A.2d 98. "For liability to attach, the purchasing corporation must represent merely a `new hat' for the seller." Ibid. The court held continuity of manufacturing operations a minimum requirement but stated that there should be much more than that including continuity of stockholders and management. Id. at 570, 264 A.2d 98.
In Ramirez, supra, 86 N.J. at 342, 431 A.2d 811, the Court summed up the business continuation exception as follows: "In like manner, narrow application of McKee `s `continuation' exception causes liability vel non to depend on whether the plaintiff is able to establish that there is continuity in management, shareholders, personnel, physical location, assets and general business operation between selling and purchasing corporations following the asset acquisition." Thus, if plaintiff cannot meet the more expanded Ramirez product-line exception, he cannot succeed under the traditional corporate-law test.
Affirmed.