[No. C008749. Third Dist. Nov. 22, 1991.]

ROGER E. STEWART et al., Plaintiffs and Appellants, v.
TELEX COMMUNICATIONS, INC., Defendant and Respondent.

**COUNSEL**

Thorsnes, Bartolotta, McGuire & Padilla, Michael D. Padilla, R. Christian Hulburt and Daral Mazzarella for Plaintiffs and Appellants.

Weintraub, Genshlea, Hardy, Erich & Brown, Thomas C. Richards and Charles E. Bauer for Defendant and Respondent.

## OPINION

**SPARKS, J.**—Plaintiff Roger E. Stewart was horribly burned when the antenna he was installing on a roof came into contact with a high voltage wire, sending a surge of electricity through his body. In this action for strict liability, the plaintiff and his wife, Lora, claim the antenna was defectively insulated and failed to carry an adequate warning. But the manufacturer of the offending antenna had long since declared bankruptcy and gone out of business. The defendant, Telex Communications, Inc. (Telex), purchased most of the bankrupt manufacturer's assets from the trustee in bankruptcy. The question on appeal is whether the defendant is subject to liability for plaintiffs' injuries on a "successor corporation" theory. The trial court granted the defendant's motion for summary judgment and dismissed the action because it did not find any successor liability. Because defendant was not a causal factor in the bankruptcy of the manufacturer, we agree that it did not assume any liability for the defective product of the bankrupt manufacturer when it purchased the assets from the trustee. We shall therefore affirm.

I

*Summary Judgment Motion*

■ "Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. [Citations.] First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] [Second], we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in [the] movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. . . . A sufficient motion cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].) Because the facts are not disputed, we need only briefly recount the allegations of the complaint and the showing made in the motion for summary judgment.

## A.

The allegations material to this appeal are minimal.[1] This action, as noted, arose from severe personal injuries suffered by plaintiff on July 27, 1984, while erecting an antenna for a citizen's band radio on a friend's roof. The antenna inadvertently came into contact with an overhead power line, allowing high-voltage electricity to course through him and burn him. The antenna had been manufactured by Hy-Gain Electronics Corp. (Hy-Gain). In connection with their strict liability theory of tort liability (containing the sole allegations relevant to defendant Telex), the plaintiffs alleged, "defendant Hy-Gain Electronics Corp. . . . prior to April 20, 1978, was engaged in the business of manufacturing, designing, assembling, inspecting, packaging and distributing C.B. antennae[] for sale to the general public, including the particular Hy-Gain Model 500 referred to herein." At all times prior to the accident, Hy-Gain Electronics Corp. "knew of the high probability and intended that its antennae, including the Model 500, would be purchased, used and installed by members of the general public without inspection for defects." On or about April 20, 1978, "defendant TELEX . . . purchased all [Hy-Gain Electronics Corp.'s] assets and thereby acquired, among other things, the manufacturer's plant, equipment, fixtures, inventory, trade name, goodwill[,] and customer lists, and since that date ha[s] continued to manufacture and sell C.B. antennae to the general public." The plaintiffs further alleged the Hy-Gain Model 500 antenna was defective in design and manufacture because it had "no or insufficient insulation against electric current and shock" and because it had inadequate warnings of its "extreme and dangerous electric conductivity." As a result, when Mr. Stewart was installing the antenna in a foreseeable and intended manner, he was injured as a "direct and proximate result of the defects . . . described [above] . . . ." Mrs. Stewart appended a cause of action for loss of consortium. In its answer, defendant denied all of these allegations.

## B.

The defendant had originally moved for summary judgment in 1989. The court ultimately denied the motion without prejudice because it found a triable issue of material fact as to who manufactured the antenna and because it believed the facts were sufficiently similar to *Ray v. Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3], to come within *Alad*'s announced special exception to the general rule against imposition upon a successor corporation of its predecessor's liabilities. (*Id.* at p. 30.) In the trial

---

[1]Although the plaintiffs describe in detail the nature of the accident and the resulting injuries in their appellate brief, these facts are entirely irrelevant to the legal issue confronting us, so we have no occasion to recount them here.

court's view, "those similarities essentially are that there is no remedy for the Plaintiff against the predecessor. The successor does have the ability to spread this risk and the successor has been in fact utilizing the goodwill and reputation of the predecessor."

The defendant renewed its motion for summary judgment in 1990. As part of that motion, defendant filed its separate statement of undisputed material facts. (Code Civ. Proc., § 437c, subd. (b).) In their response to this statement of undisputed facts, plaintiffs agreed it was undisputed that the particular antenna involved in the accident was manufactured and sold by Hy-Gain before 1976; that Hy-Gain petitioned for bankruptcy; and that the defendant had purchased some of Hy-Gain's assets, including antennas, from the trustee in bankruptcy in a subsequent bankruptcy sale.

In their responding statement, plaintiffs also set forth "additional disputed and undisputed material facts."[2] These facts showed that plaintiff Roger Stewart was injured while installing a Model 500 Penetrator antenna and that Hy-Gain manufactured that model. They further revealed that defendant made the following purchases of assets previously owned by Hy-Gain: (1) several manufacturing facilities, including the main facility in Lincoln, Nebraska, as well as two hangar facilities there, and two facilities in Puerto Rico; (2) all of its manufacturing equipment, machinery, tools and tooling, including those specifically relating to the manufacture of antennas; (3) all of its inventory, including raw materials, semifinished goods and finished goods, with the exception of certain radios; (4) all of its manufacturing designs, plans, blueprints, engraving and drawings, including those relating to the antennas and specifically including the Model 500 Penetrator antenna; (5) its ownership interest in offices, including the office furniture, furnishings, equipment and fixtures, with the exception of the furniture and fixtures in the main corporate office; (6) all of its patents, patents pending, trademarks, and trade names, including those relating to antennas and the Model 500 Penetrator antenna; (7) all of its customer lists; and (8) all of its sales orders and its cost records, production records and similar books and records for the purpose of determining and evaluating price and production. In addition to these purchases, defendant also "employed Hy-Gain's personnel, including management and factory personnel to continue in the manufacturing operations at Hy-Gain's facilities." In addition, defendant created a Hy-Gain Division and continued using the Hy-Gain trademark in manufacturing and selling antennas, specifically including the Model 500 Penetrator.

---

[2]The summary judgment statute provides that the responding statement shall also "set forth plainly and concisely any other material facts which the opposing party contends are *disputed.*" (Code Civ. Proc., § 437c, subd. (b) [italics added].) Thus, the statute does not contemplate a separate responding statement which contains new facts which are claimed to be *undisputed.* But defendant makes no objection to this procedure and we therefore have no occasion to consider the question further.

Finally, defendant "manufactured and sold through its Telex/Hy-Gain Division a Model 500 Penetrator antenna identical to that manufactured by Hy-Gain."

In its order granting the defendant's motion for summary judgment, the trial court held that the *Alad* exception applied only where the successor's acquisition of assets is the cause of the extinction of the plaintiffs' remedies against the predecessor. Since it was the bankruptcy of Hy-Gain which had destroyed the present plaintiffs' remedy against it, and not the purchase by defendant of the bankrupt's assets, defendant was without liability.

## II

### *Liability of Successor Corporation*

We turn to the legal question of whether defendant Telex is entitled to summary judgment on these facts. The logical springboard of our analysis is the decision in *Ray* v. *Alad Corp., supra,* 19 Cal.3d 22. As a treatise explains it, "[a]lthough an entity is not involved in the design, manufacture, assembly, marketing or distribution of a product, under a special exception judicially created by the California Supreme Court [in *Alad*], it is possible for that entity to be held strictly liable in tort for a defect in a product." (Brisbois, Cal. Products Liability (1985) § 41, p. 50.) In *Alad*, "prior to plaintiff's injury [Alad II] succeeded to the business of [Alad I] through a purchase of Alad I's assets for an adequate cash consideration. Upon acquiring Alad I's plant, equipment, inventory, trade name, and good will, Alad II continued to manufacture the same line of ladders under the 'Alad' name, using the same equipment, designs, and personnel, and soliciting Alad I's customers through the same sales representatives with no outward indication of any change in the ownership of the business." (19 Cal.3d at pp. 24-25.) The high court recognized that under traditional principles governing the transfer of liability from one corporation to another in a sale of assets, Alad II would not be liable, an insulation from liability promoting the free availability and transferability of capital. (*Id.* at pp. 25, 28-30.) In the view of the court, however, the considerations underlying this traditional rule were outweighed "under the narrow circumstances here presented." (*Id.* at p. 25.) As the court explained, "[j]ustification for imposing strict liability upon a successor to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for

defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Id.* at p. 31 [italics deleted].)

In connection with the first of these considerations, the *Alad* court found the plaintiff's presumed cause of action against Alad I faced "insuperable obstacles" because Alad I's tangible and intangible assets had been acquired by Alad II and Alad I had been dissolved. (19 Cal.3d at pp. 31-33.) As for the second, "[w]hile depriving plaintiff of redress against the ladder's manufacturer . . . , the transaction by which Alad II acquired Alad I's name and operating assets had the further effect of transferring to Alad II the resources that had previously been available to Alad I for meeting its responsibilities to persons injured by defects in ladders it had produced. . . . With these facilities and sources of information, Alad II had virtually the same capacity as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance coverage or planning self-insurance. . . . Immediately after the takeover it was Alad II, not Alad I, which was in a position to promote the paramount policy of the strict products liability rule by spreading throughout society the cost of compensating otherwise defenseless victims of manufacturing defects." (*Id.* at p. 33 [original quotation marks & brackets deleted].) Finally, the court found it was fair to impose this burden on a successor which made "a deliberate albeit legitimate exploitation of [the] established reputation as a going concern manufacturing a specific product line . . . . By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (*Id.* at p. 34 [internal quotation marks deleted]; see 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1273, pp. 717-720; 2 Frumer & Friedman, Products Liability (1990) Successor Corporations, § 7.05[1], p. 7-44 [both discussing the *Alad* decision].)

As noted by the plaintiffs, the sole distinction between *Alad* and the present case is that "Telex purchased Hy-Gain assets through the intermediary of the bankruptcy courts[] rather than directly." Asserting this to be an insignificant distinction, plaintiffs rely on the interpretation of *Alad* espoused in *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890 [159 Cal.Rptr. 119]. In brushing aside distinctions postulated by the *Rawlings* successor-defendants between their facts and *Alad*,[3] the *Rawlings* court stated, "In our view, *Alad* should not be construed so narrowly as to create an exclusive exception to the general rule for successor [non]liability . . . only in an *Alad* clone. It is essential to focus on the policy considerations underlying strict

---

[3]These facts have no application to the present case and thus we do not recount them.

products liability rather than merely counting the factors mentioned in *Alad* and giving each equal weight. The constant theme of strict tort liability has been to 'elevate justice and equity above the exact contours of a mathematical equation. . . .' " (*Id.* at p. 900.) In the *Rawlings* court's view, "[t]he thrust from our high court as a matter of first priority has been to maximize recovery for the victim. . . . The broader interpretation we give to *Alad* is in line with these principles." (*Id.* at p. 901.)

We agree that stare decisis would be unworkable if we required factual clones before applying the principles of an earlier case. But this does not resolve the problem of whether an intermediary of bankruptcy rather than a direct and consensual sale between entities is or is not a significant distinction from *Alad*'s facts. To resolve that question, we turn to two other California cases discussed by the parties.

In *Lundell* v. *Sidney Machine Tool Co.* (1987) 190 Cal.App.3d 1546 [236 Cal.Rptr. 70], the entity which in 1956 had manufactured the lathe involved in the litigation was bought first by one entity in 1961, which then sold it to another entity in 1963, which in turn ceased producing lathes in 1964, then liquidated its assets and was purchased by yet another entity in 1967. Finally, in 1974, a proprietorship bought the designs and specifications necessary to create replacement parts for the original lathes and adopted the name of the original entity. (*Id.* at pp. 1549-1550, 1551.) Under these circumstances, the *Lundell* court held that the proprietorship was not liable as the successor of the manufacturer. The court emphasized the nature of the business had changed, the size had drastically decreased, a significant portion of the original entity's assets were not included in the sale to the proprietorship, and any destruction of the plaintiff's remedies was not caused by the sale to the proprietorship. (*Id.* at p. 1551-1552.) "The successor, to be liable, must have played some role in curtailing or destroying the [plaintiff's] remedies." (*Id.* at p. 1553 [internal quotation marks deleted].) The court thus found the first prong of *Alad* had not been satisfied (nor, for that matter, were the second or third (*id.* at pp. 1553-1557)).

In *Phillips* v. *Cooper Laboratories* (1989) 215 Cal.App.3d 1648 [264 Cal.Rptr. 311], the plaintiffs brought a products liability action for injuries caused by the fertility drug diethylstilbestrol (DES). The original manufacturer of the drug, E. S. Miller Laboratories, Inc. (Miller), was acquired by Nestlé, LeMuir Company, Inc. (Nestlé), which then over the course of 20 years engaged in a dizzying amount of reshuffling of functions and operations between Miller and other of its subsidiaries. Ultimately, one of the entities merged into Cooper Laboratories, Inc. (Cooper). (*Id.* at pp. 1652-1653.) The trial court had traced liability from Miller to an intermediate

entity, Smith, Miller & Patch, Inc. (SMP-NY), under *Alad*'s exception to traditional corporate nonliability, then traced it from the intermediate entity to Cooper under traditional corporate law principles. (*Id.* at p. 1655.) The court found the destruction of the plaintiffs' remedies against Miller had not been caused by the intermediate entities' acquisition of Miller's product line, sales force, and inventory, since Miller continued to exist as a separate entity for another 10 years at greater profitability than before, until ultimately dissolved by Nestlé in an action unrelated to the intermediate entities' continuation of the product-line functions of Miller. (*Id.* at pp. 1658-1659.) In the view of the *Phillips* court, "successor liability of SMP-NY for acts of Miller must be denied because the dissolution of Miller, depriving the [plaintiffs] of a remedy against Miller, was for a reason totally independent of any action or contributing cause of SMP-NY." (*Id.* at p. 1659.)

Two other cases continue this theme of causation. In *Kaminski* v. *Western MacArthur Co.* (1985) 175 Cal.App.3d 445 [220 Cal.Rptr. 895] (a case relied on by both the *Lundell* and *Phillips* courts), the original entity (Western) abdicated all management control to representatives of another entity (Mac-Arthur) in exchange for an influx of cash (*id.* at pp. 451-452); Western later agreed to transfer all its operations and assets to a new subsidiary of MacArthur called Western MacArthur. Western formally dissolved two years later. (*Id.* at pp. 452-453.) The *Kaminski* court stated, "Successor liability has generally been denied for a lack of causation in situations showing no contributory cause in the predecessor's demise, such as when the predecessor sells product line assets but dissolves at a later date and for an independent reason." (*Id.* at p. 458.) The court found this was not the factual situation before it. "We may readily conclude that the transaction was an acquisition of principal assets which caused or at least substantially contributed to the absence of Western from the recovery pool [for] product liability plaintiffs, and [to] the destruction of Jack and Rose Kaminski's remedies against it." (*Ibid.*) The fact Western might have gone bankrupt without intervention was irrelevant; "[i]t may be true that had Western MacArthur not acquired the corporation, it would have failed; the fact is it *did* step in, t[ook] the assets and goodwill of Western[,] and cause[d] it to dissolve." (*Ibid.* [italics supplied].)

While these cases may be factually distinguishable from the present circumstances, it can be seen that a causal element has been firmly established in California jurisprudence in the interpretation of *Alad* by the Courts of Appeal. It may well be true, as one commentator has asserted, that "this causation requirement is not a strict one, and sufficient causation will be found as long as the successor played some role in curtailing or destroying

plaintiff's remedies . . . . Thus, when a successor [as in *Kaminski, supra,* 175 Cal.App.3d 445] forces a corporation to dissolve by exercising its financial power as a creditor and its right to dictate policy to the directors of the corporation, sufficient causation exists." (Cotchett & Cartwright, Cal. Products Liability Actions (rev. ed. 1991) § 2.14[5], p. 2-74.1.) Nevertheless, some causal connection between the succession and the destruction of the plaintiff's remedy must be shown. While the rationale for the necessity of causation is not particularly explicit in these decisions, cases from other jurisdictions applying the *Alad* rationale discuss the purpose of such an element.

The Washington Supreme Court, having earlier adopted *Alad,* stated in *Hall* v. *Armstrong Cork, Inc.* (1984) 103 Wash.2d 258 [692 P.2d 787], "A key premise of the product line exception is that successor liability is only appropriate when the successor corporation by its acquisition actually played some role in curtailing or destroying the claimants' remedies. In such a way, the product line rule strikes a desirable balance between the competing concerns of products liability and a corporation's need to limit its risk exposure. [¶] Imposing liability upon [the successor here] would promote the policies of risk spreading and compensation. Indeed, successor liability under any circumstances would promote these policies. It is the element of causation, however, that tips the balance in favor of imposing successor liability. The traditional corporate rule of nonliability is only counter-balanced by the policies of strict liability when acquisition by the successor, and not some [other] event or act, virtually destroys the ability of the plaintiff to seek redress from the manufacturer of the defective product." (*Id.* at p. 792.) As the court concluded, "The destruction of the predecessor by acquisition and the benefits derived by the successor from the predecessor's product line preserves a sense of balance in the rule of successor liability, making [the product line exception] more than an unbalanced assertion of social policy." (*Id.* at p. 792] [italics added & citation deleted].)

In *Kline* v. *Johns-Manville* (9th Cir. 1984) 745 F.2d 1217, the federal appeals court applied *Alad* in a diversity suit and agreed with its trial court "that the asset sale [must] contribute to the destruction of the plaintiffs' remedies." (*Id.* at p. 1220.) It found that element missing in the case before it. "Absent the sale [of the product line], therefore, the plaintiffs would have had the same right they now have: the right to file claims against [the predecessor] in the bankruptcy proceeding [filed 20 years after the sale of the product line]. Unlike the plaintiff in *Ray,* who sought only to avoid a worsening of his position by reason of the sale of assets, the plaintiffs here seek to better theirs. . . ." (*Ibid.*)

This brings us to a case nearly identical to the one before us. In *Nelson v. Tiffany Industries, Inc.* (9th Cir. 1985) 778 F.2d 533, "Moody manufactured the grain auger in question in 1966. In January[] 1970, Moody filed a voluntary petition for reorganization . . . . In April[] 1970, Tiffany purchased all of Moody's assets in a bankruptcy[-]court-approved sale. Moody did not emerge from reorganization proceedings as a viable corporate entity. Seven years later Nelson was injured." (*Id.* at p. 537 [fn. deleted].) Relying on *Kline*,[4] the *Nelson* court stated, "Moody's voluntary petition for reorganization, as contrasted with the contractual requirement that Alad I dissolve its corporate existence as a condition of the sale of its assets in *Ray*, clearly distinguishes the two cases. . . . Thus, it was Moody's bankruptcy and not Tiffany's subsequent purchase of the assets that destroyed Nelson's remedies. Even if there had been no sale of assets to Tiffany, Nelson would not be in any better position today to proceed against Moody." (*Id.* at p. 537 [italics & fn. omitted].)

We agree with these decisions that a causation element is necessary to ensure a plaintiff does not actually gain a "windfall defendant" who would not otherwise be available. We also agree a causation element limits the judicial derogation of the settled principles of nonliability in corporate law through the judicial assertion of the amorphous concept of public policy, which can also travel infinitely in a vacuum. (Cf. *Newton v. Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386, 391 [228 Cal.Rptr. 890].) Moreover, in the bankruptcy context, the policy in favor of discharge of debt in bankruptcy could be inhibited by a holding that assets of the bankrupt would be infected with the bankrupt's inchoate and unknown tort liability, since a reluctance on the part of purchasers would be certain to exist unless the value of the bankrupt's assets were further discounted. This tips the balance back in favor of nonliability.

There being no showing of causation here in the voluntary bankruptcy of Hy-Gain, nor any showing it was a mere subterfuge to avoid the holding of *Alad*,[5] summary judgment was properly granted, as the *Alad* exception was inapplicable to Telex.

---

[4]The *Nelson* court found the *Kline* case not to be dispositive because it involved only a partial acquisition 20 years before the eventual bankruptcy rather than a total acquisition following bankruptcy. (778 F.2d at pp. 536-537 & fn. 4.)

[5]Such a subterfuge conceivably might satisfy the causation requirement (see *Nelson, supra*, 778 F.2d at p. 538), although we need not explore the possibility in this opinion.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Nicholson, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 20, 1992.