734 A.2d 290

JUSTIN LEFEVER, PLAINTIFF–RESPONDENT, v. K.P. HOVNANI-
AN ENTERPRISES, INC., LULL ENGINEERING CO., INC.
AND GILES & RANSOME, INC., INDIVIDUALLY AND T/A
RANSOME LIFT, DEFENDANTS, AND LULL INDUSTRIES,
INC., DEFENDANT–APPELLANT.

Argued January 21, 1999—Decided July 29, 1999.

308

*Steven I. Greene* argued the cause for appellant (*Mr. Greene*, attorney; *Mr. Greene* and *Ira S. Broadman*, a member of the Arizona bar, on the briefs).

*Dennis S. Brotman* argued the cause for respondent (*Brotman & Graziano*, attorneys).

The opinion of the Court was delivered by

OHERN, J.

This appeal concerns the meaning of the product-line exception in *Ramirez v. Amsted Industries Inc.*, 86 *N.J.* 332, 431 *A.*2d 811 (1981), when a successor corporation acquires the predecessor's product line through a bankruptcy sale.

█ The general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller. Traditionally, there have been only four exceptions: (1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability. 15 William & Fletcher, *Cyclopedia of the Law of Corporations* § 70, 122 nn. 9–15 (1990).

█ New Jersey, along with several other jurisdictions, has adopted a product-line exception to the general rule. Under that doctrine, by purchasing a substantial part of the manufacturer's assets and continuing to market goods in the same product line, a corporation may be exposed to strict liability in tort for defects in the predecessor's products. The question in this appeal is whether the product-line exception is applicable when the successor has purchased the predecessor's assets at a bankruptcy sale. Our task is made easier in this case because the bankrupt was not the

manufacturer of the defective product, but rather an intermediary owner of the product line against whom no claim had been made by the injured party.

I

The facts of this case are more fully set forth in the reported opinion of the Appellate Division, 311 *N.J.Super.* 1, 709 *A*.2d 253 (1998). For convenience, we shall eliminate reference to certain intermediate business entities used by the parties. Conceptually, there were three distributors of the product line. Plaintiff, Justin Lefever, was injured in 1989 when a forklift he was operating tipped over and caused him to suffer crushing injuries. The Lull Engineering Corporation, Inc., whom we shall refer to as "Lull I," had manufactured and distributed the forklift. Through a series of transfers, Lull I's assets were acquired in 1986 by Lull Corporation ("Lull II"). In 1992, Lull II went into bankruptcy. In November 1993, the trustee in the bankruptcy proceedings conveyed to Lull Industries Inc. ("Lull III"), interests in substantially all of Lull II's assets.

On September 24, 1990, plaintiff sued "Lull Engineering Co., Inc." in the Superior Court, Law Division, Middlesex County.[1] Plaintiff never sued Lull II. During the course of discovery, plaintiff learned that Lull II had acquired the assets of Lull I, and that Lull II had transferred its assets to Lull III through a bankruptcy sale. Plaintiff joined Lull III as a party defendant. Lull III moved to dismiss plaintiff's claim on the basis that the bankruptcy sale was free and clear of any interests in the property, including any successor-liability claims. The trial court granted Lull III's motion.

---

[1] Although plaintiff in fact named as defendant a company that purchased Lull I's assets and later sold them to Lull II, it appears that plaintiff intended to sue Lull I, whose name is virtually identical to the name of its immediate successor. The named defendant has been a dormant corporation with no assets since 1986.

On appeal, the Appellate Division reversed. The Appellate Division found that plaintiff had brought his complaint against the manufacturer and current defendant, Lull I, rather than against Lull II, the bankrupt. 311 *N.J.Super.* at 7, 709 *A.*2d 253. The court noted that "plaintiff does not claim an interest in the property of Lull [II]" and the bankruptcy court order "does not affect plaintiff's products liability claim against Lull [III] as a successor corporation of the Lull Engineering entities." *Id.* at 9, 709 *A.*2d 253. The court found that "Lull [III] has not established, and it is unlikely it could establish, that plaintiff would have received full satisfaction for his damages had he filed a claim against Lull [II] in the Bankruptcy Court." *Ibid.* We granted Lull III's petition for certification, 156 *N.J.* 387, 718 *A.*2d 1217 (1998).

## II

*What are the sources of the product-line exception to the general rule against successor liability?*

As the comparable doctrine of privity once sheltered the manufacturers of products from consumer claims, the doctrine of corporate-successor liability is an example of a doctrine previously "resting on formalistic and conceptual foundations" that has become a doctrine "with functional and pragmatic roots rather than conceptual roots." Phillip I. Blumberg, *The Continuity of the Enterprise Doctrine: Corporate Successorship in United States Law,* 10 *Fla.J. Int'l L.* 365, 366–67 (1996). The new doctrines "focus[ ] on the economic realities of the enterprise rather than on the [involved] entity . . . ." *Id.* at 367. In *Ramirez, supra,* Justice Clifford traced the evolution of the law of corporate-successor liability for defective products. "[T]he traditional corporate approach [to successor liability] has been sharply criticized as being inconsistent with the rapidly developing principles of strict liability in tort and unresponsive to the legitimate interests of the products liability plaintiff." *Ramirez, supra,* 86 *N.J.* at 341, 431 *A.*2d 811. The traditional rule "was designed for the corporate contractual world where it functions well." *Polius v. Clark Equipment Co.,*

802 *F.2d* 75, 78 (3d Cir.1986). "Strict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to non-liability, and places unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction." *Ramirez, supra,* 86 *N.J.* at 341–42, 431 *A.*2d 811.

The first crack in the traditional rule of non-liability occurred in 1974. *See Knapp v. North Am. Rockwell Corp.,* 506 *F.2d* 361 (3d Cir.1974), *cert. denied,* 421 *U.S.* 965, 95 *S.Ct.* 1955, 44 *L.Ed.2d* 452 (1975). In *Knapp* the Third Circuit eliminated the requirement in *de facto* mergers that the selling corporation dissolve after the transfer of the assets. The court said, "Pennsylvania courts have emphasized the public policy considerations served [in products liability law] by imposing liability on the defendant rather than formal or technical requirements." *Id.* at 367. Thus, although the selling corporation had not dissolved after the transfer of assets, the court observed that if the successor were not held liable, the plaintiff would be left without a remedy. The plaintiff in *Knapp* had been injured when his hand was caught in a "Packomatic" machine manufactured by the selling corporation. Although the Third Circuit recognized that neither the predecessor nor the successor was in a position to avoid the accident, it concluded that the successor was the party better able to spread the burden of the loss. *Id.* at 370.

In *Turner v. Bituminous Casualty Co.,* 397 *Mich.* 406, 244 *N.W.2d* 873 (1976), the Michigan Supreme Court relaxed the traditional rule that would not have imposed liability. The Michigan court expanded the "mere continuation" exception to the traditional rule of non-liability. *Id.* at 892–94. After observing that there would have been liability under the *de facto* merger exception if the acquisition had been made for stock rather than cash, the court held that it could find no reason to treat acquisitions for stock or cash differently. It found that the analysis in *Knapp* should also apply to cash transactions, and concluded that it would be proper to impose liability on the purchasing corporation after an evaluation of such factors as the ownership and management of the successor's corporate entity and its personnel,

physical location, assets, trade name, and general business operation.

"[A]s to the injured person, distinctions between types of corporate transfers are wholly unmeaningful." *Powers v. Baker–Perkins, Inc.*, 92 *Mich.App.* 645, 285 *N.W.2d* 402, 405 (1979). The functional result is the same whether the transfer results from (1) a traditional merger accompanied by an exchange of stock of the corporations, or (2) a *de facto* merger brought about by the purchase. The inquiry is framed not by the manner in which the successor corporation acquires the assets, but rather by what it does with the assets after it acquires them.

In 1977, the year after the decision in *Turner, supra,* the California Supreme Court adopted the "product line exception." *See Ray v. Alad Corp.*, 19 *Cal.3d* 22, 136 *Cal.Rptr.* 574, 560 *P.2d* 3 (1977). In *Ray*, the buyer had purchased the seller's physical plant, manufacturing equipment, inventories, trade name, good will, and records of manufacturing designs. The buyer continued the employment of the factory personnel and hired the seller's general manager as a consultant. The buyer also continued to manufacture the same product line under the same name and held itself out to potential customers as the same enterprise. The California Supreme Court concluded "that a party [that] acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired." *Ray, supra,* 136 *Cal.Rptr.* 574, 560 *P.2d* at 11. Its justification for imposing strict liability

> rest[ed] upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading [role] and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.
> 
> [*Id.* at 9.]

After analyzing the differences between the continuity exception formulated by the Michigan Supreme Court in *Turner* and the

product-line exception in *Ray*, the *Ramirez* Court adopted the rule of *Ray* with its focus on the product causing the injury. Concerning its own justifications for the "product line" exception, the Court in *Ramirez* emphasized the two latter justifications of spreading the risk and enjoyment of the predecessor manufacturer's good will. In both *Ramirez* and *Nieves v. Bruno Sherman Corp.*, 86 *N.J.* 361, 431 *A.*2d 826 (1981), the successor corporation's acquisition of the product line had not been the event that caused the loss of the plaintiff's remedies against the original manufacturer. The Court said, "What is most important, however, is that there was continuity in the manufacturing of the ... product line throughout the history of these asset acquisitions." *Ramirez, supra*, 86 *N.J.* at 350, 431 *A.*2d 811.

The drafters of the *Restatement (Third)* have rejected the product-line exception adopted in New Jersey. *See Restatement (Third) of Torts: Products Liability*, § 12, comment b. The reporters to the *Restatement* observed that exceptions to the general rule against holding successors liable are not unique to products liability law and the *Restatement (Third)*, but that the exceptions are designed to preserve fundamental principles of debtor-creditor law. *Id.* at comment a. It strikes us as somewhat anomalous that after the long journey from *MacPherson v. Buick Motor Co.*, 217 *N.Y.* 382, 111 *N.E.* 1050 (1916), the drafters of the *Restatement (Third)* would frame the issue in terms of contract law, not products liability law.

Not surprisingly, "a strong minority of states take less restrictive positions on successor liability than the position set forth in the *Restatement (Third)*." Richard L. Cupp, Jr., *Liability of Successor for Harm Caused by Defective Products Sold Commercially by Predecessor*, 8 *Kan.J.L. & Pub. Pol'y* 113, 114 (1998). "Thirteen jurisdictions, representing 43 percent of the United States' population, follow either the product line approach or the continuity of enterprise approach." *Ibid.*[2]

---

[2] Professor Cupp bases the 43 percent figure on an assessment of "state supreme court decisions, lower court decisions where there is not a state

## III

*Does the supremacy of federal bankruptcy law prevent the application of state common law to claims against a successor business enterprise that has acquired its assets through a bankruptcy sale?*

■ The short answer to this question is "yes," but only if the federal bankruptcy court has "dealt with" the claim. The long answer requires us to examine the function of a bankruptcy sale and to determine what effect a bankruptcy sale may have on other principles of law affecting the liability of a successor business enterprise. For purposes of this analysis, we will draw essentially on a summary of the law of bankruptcy sales set forth by Michael H. Reed in *Successor Liability and Bankruptcy Sales,* 51 *Bus. Law.* 653 (1996). This recital is not intended to be a digest of bankruptcy law but only a brief outline of what we understand to be the governing principles that apply in federal courts.

> There are essentially two ways [in which] a bankruptcy trustee or debtor-in-possession can sell assets: (i) a sale pursuant to section 363 of the Code; or (ii) a sale pursuant to a confirmed Chapter 11 plan of reorganization.
>
> [*Id.* at 655.]

### a. Does a Section 363 sale cut off product liability claims?

■ Section 363(f) of the Bankruptcy Code (the Code), 11 *U.S.C.A.* § 363(f) (1978), authorizes the trustee or debtor-in-possession to sell property of the estate "free and clear of the 'interest' of another entity in such property...." Reed, *supra,* 51 *Bus.Law.* at 655. The primary purpose of that provision is "to permit the sale of property free and clear of the liens of secured creditors." *Id.* at 656.

Some courts have held that notwithstanding the use of the term "interest" in section 363(f), the bankruptcy court has "the power to convey assets free and clear of not only property interests, such as

---

supreme court decision, and federal decisions attempting to predict what approach a state would adopt." *Ibid.*

liens and encumbrances, but also preconveyance claims, or in personam liabilities of the transferor." *Id.* at 664–65.

"Other courts, however, have held that, because the plain language of section 363(f) speaks only of 'interests' and makes no mention of 'claims,' it does not provide authority for a sale free and clear of preconveyance claims because claims, as distinguished from 'liens' and 'encumbrances,' are not property interests." *Id.* at 665. Again, the author explains:

[I]t is difficult to quarrel with these [latter] decisions. The term "interest," while undefined, clearly connotes some form of property interest as it is utilized throughout the Code. It includes the property interest of an equity security holder ... as well as the property interest of a lienholder.... Creditor-held interests clearly include not only "liens" but also "charges."

[*Id.* at 675 n. 62.]

There is nothing in the Code, however, to suggest that the term "interest" was intended to embrace rights to payment, which are the substantive nuclei of bankruptcy "claims." *See ...* § 101(5) [of the Code]; *see also Fairchild Aircraft, Inc. v. Campbell (In re Fairchild Aircraft Corp.)* [discussed *infra* at 318, 734 A.2d at 296], wherein Judge Clark explained: "Section 363(f) does not authorize sales free and clear of any interest, but rather of any interest in such property.... The sorts of interests impacted by a sale free and clear are *in rem* interests which have attached to the property." *Id.* at 917–18.

[*Id.* at 675.]

### b. Does a Chapter 11 sale cut off products liability claims?

Reed suggests (consistent with the initial paragraph under subsection "a") that a sale pursuant to a reorganization would be more likely to cut off claims based on preconfirmation conduct.

Selling assets pursuant to a Chapter 11 plan arguably provides more protection from successor liability than does a sale pursuant to section 363 of the Code. Section 1123(a)(5)(D) of the Code authorizes the sale of "all or any part of the property of the estate, either subject to or free of any lien" pursuant to a confirmed Chapter 11 plan of reorganization. Section 1141(c) of the Code provides that any property "dealt with" by a plan shall be "free and clear of all claims and interests of creditors, equity security holders, and general partners in the debtor." This language has been interpreted by some courts and commentators to mean that property sold pursuant to a plan has been "dealt with" by the plan and, therefore, such property is free and clear of any claims arising from the trustee's or debtor's preconveyance conduct, including successor liability claims.

[Reed, *supra*, 51 *Bus.Law.* at 666–67.]

However, whether the latter interpretation of the language of section 1141 is correct remains unclear. Reed cites two recent decisions holding that a sale free and clear through a Chapter 11 plan did not insulate the transferee from successor liability claims. In *In re Savage Industries, Inc.*, 43 *F*.3d 714 (1st Cir.1994), the court found it unimportant that the debtors' subsequently-confirmed Chapter 11 plan ratified the sale and purported to relegate all claimants to their *pro rata* shares of the net proceeds of the sale. In *In re Fairchild Aircraft Corp.*, 184 *B.R.* 910 (Bankr. W.D.Tex.1995), *vacated as moot on equitable grounds*, 220 *B.R.* 909 (Bankr.W.D.Tex.1998), the court held that the purchaser of an aircraft manufacturing business at a bankruptcy sale was subject to successor liability regarding a claim for damages allegedly caused by defects in an aircraft manufactured by the bankrupt.

The bankruptcy court in *In re White Motor Credit Corp.*, 75 *B.R.* 944, 950 (Bankr.N.D.Ohio 1987) considered "whether the state law [imposing successor liability] frustrates the full objective of the federal [bankruptcy] legislation." The court concluded that the state law was preempted because "[t]he federal purpose of final resolution and discharge of corporate debt is clearly compromised by imposing successor liability on purchasers of assets when the underlying liability has been discharged under a plan of reorganization." *Ibid.* However, other courts have disagreed with the suggestion that imposition of successor liability in the context of a bankruptcy sale actually frustrates the purposes of the Code. In *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 *F*.3d 48 (7th Cir.1995), a multi-employer pension fund sought to recover against a bankrupt furniture company that had allegedly failed to pay over $300,000 to the fund. The fund attempted to recover in the Chapter 7 liquidation proceeding, but with no success. The furniture company had entered into a debt compromise agreement with its secured lender. The company then turned the interest over to a successor company, which promptly foreclosed on the collateral. Two years after the bankruptcy case was closed, the fund brought an action against the successor

company on a theory of successor liability. The district court dismissed the case and the Seventh Circuit reversed. The court rejected the argument that successor liability "frustrates the orderly scheme of the Bankruptcy Code by allowing some unsecured creditors to leapfrog over others[,] ... [because] once a bankruptcy proceeding is completed and its books closed, the bankrupt has ceased to exist and the priorities by which its creditors have been ordered lose their force." *Id.* at 51. "[A] second chance is precisely the point of successor liability." *Ibid.*

That a Chapter 11 sale will resolve the question of successor liability is thus by no means clear. Courts analyzing the scope of the power of bankruptcy courts to sell property free and clear of claims reason that the breadth of such power is coextensive with the courts' power to discharge claims under the Code.

Thus, a claimant asserting successor liability would argue that even if, as a general proposition, the bankruptcy court has the power to convey assets free and clear of "claims," it does not have the power to cut off obligations or rights, such as environmental agency injunctions or future products liability claims, which are not cognizable as claims for dischargeability purposes. Such claims could not be divested, regardless of whether the sale is made within or outside of a plan of reorganization.

[Reed, *supra,* 51 *Bus.Law.* at 669–70.]

Although the asset purchase agreement between the trustee and the buyer at the bankruptcy sale expressly recites that the purchaser "will not assume, undertake, accept or be bound by or responsible for ... any liabilities or obligations of Lull or Erickson or their affiliates that arise or have arisen prior to the Closing Date," such disclaimers are ineffective in insulating the buyer from successor liability when other principles of law require the imposition of liability. *See Ramirez, supra,* 86 *N.J.* at 344, 431 *A.*2d 811 (discussing effect of disclaimer clauses under "mere continuation" theory).

Congress appears to have recognized the foregoing limitation on the scope of a bankruptcy discharge by expressly providing that in the case of debtors liable for personal injury due to asbestos-containing products, bankruptcy courts shall have the authority to insulate a successor from liability "with respect to any claim or

demand made against such entity by reason of its becoming such a transferee or successor." Reed, *supra,* 51 *Bus.Law.* at 668 (quoting 11 *U.S.C.A.* § 524g(3)(A)(ii) (1994)). In *Fairchild Aircraft, supra,* 184 *B.R.* at 931–33, which involved personal injury claims arising out of an airplane crash that occurred after a bankruptcy sale, the court refused to cut off those claims because of (1) insufficient or impossible notice to the putative successor liability claimants, (2) insufficient representation of the interests of such claimants, and (3) absence of any provision for such claimants under the plan of reorganization. *Cf. In re Piper Aircraft Corp.,* 162 *B.R.* 619 (Bankr.S.D.Fla.), *aff'd,* 168 *B.R.* 434 (S.D.Fla.1994), *aff'd and modified sub nom., Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.,* 58 *F.*3d 1573 (11th Cir.1995) (potential postconfirmation claims were not "claims" under § 101(5) of Code). Thus, even if a bankruptcy court were to seek to "deal with" preconfirmation conduct, at a minimum there probably should be notice to the class of claimants who would be subject to the claims, and some provision for such claimants should be made under the plan of reorganization. For example, in the silicone breast-implant cases, one of the manufacturers, Dow Corning, entered Chapter 11 and then sought to reach a settlement with its comprehensive general liability insurers. Although the court approving the settlement held that third parties injured as the alleged result of the defendant's silicone breast implants did not have an interest in the insurance policies, the court noted that "competing claims to the insufficient assets [would] be settled through the reorganization process ..." *In re Dow Corning Corp.,* 198 *B.R.* 214, 247 (Bankr.E.D.Mich.1996).

Justin Lefever's claim was simply not dealt with in the bankruptcy proceedings. Plaintiff was not a creditor of the bankrupt. He filed no claim in the bankruptcy proceedings. In addition, the sale here was under Section 363 and Lefever had no "interest" in the sense of a lien or encumbrance on the property. In fact, the bankruptcy trustee specifically authorized plaintiff to proceed with his suit against Lull III because the suit was not against the bankrupt. *But see In re All Am. of Ashburn, Inc.,* 56 *B.R.* 186

(Bankr.N.D.Ga.1986) (enjoining claim against successor because bankruptcy sale of assets was free and clear of all claims). The most that can be said is that the debtor, Lull II, listed plaintiff's claim in its schedule of affairs, but there was no attempt to "deal with it."

## IV

*If federal law permits it, should the principles of Ramirez call for successor liability after bankruptcy sales?*

■ This is by far the harder of the two main issues in the case. Respected commentators find the "policies behind the 'product line' exception inapplicable to the purchase of assets at a bankruptcy sale. Not only does this extension of strict liability violate basic principles of tort law, but it also contradicts the fundamental goals of the Bankruptcy Code...." David R. Kott & Walter A. Effross, *Forgive Us Our Predecessors: Bankruptcy Sales and the Product Line Exception,* 4 *Prod.Liab.L.J.* 123, 123 (May 1993). They argue that imposing successor liability amounts to creating a lien on the assets in favor of future products liability claimants and thereby decreases the sale price and effectively minimizes the assets available for the debtors. Future products liability claimants will have "jumped the line" to come out ahead of the debtor's current creditors who may be deprived of compensation for the claims. Although the argument is appealing, it has equal application to that wide variety of other contexts in which liability may be imposed on a successor. *See Chicago Truck Drivers, supra,* 59 *F.*3d at 51. For example, a purchaser of contaminated assets will be responsible for environmental cleanup costs even though the property has been acquired at a bankruptcy sale free and clear of liens. James B. Holden & Debora D. Jones, *Representing Purchasers of Assets from Bankruptcy Estates,* 20 *Colo.Law.* 2259, 2261 (1991). Liability also may be imposed on transferees in other contexts. *See, e.g., Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 *F.*2d 1323 (7th Cir.1990) (delinquent pension fund contributions); *Klegerman v. F.G. Apparel,*

*Inc.*, No. 85C7887, 1986 WL 2531 (N.D.Ill. Feb. 11, 1986) (considering successor's liability for age-discrimination claims despite acquisition of assets at bankruptcy sale).

We acknowledge that California, the jurisdiction that initiated the product-line exception, has declined to apply the exception to the acquisition of a product line through a bankruptcy sale. In *Stewart v. Telex Communications, Inc.*, 1 *Cal.App.*4th 190, 1 *Cal.Rptr.*2d 669, 675 (1991), the California Court of Appeals adopted the reasoning of the Washington Supreme Court in *Hall v. Armstrong Cork, Inc.*, 103 *Wash.*2d 258, 692 *P.*2d 787, 792 (1984), that " '[t]he traditional corporate rule of nonliability is . . . counterbalanced by the policies of strict liability [only] when acquisition by the successor, and not some [other] event or act, virtually destroys the ability of the plaintiff to seek redress from the manufacturer of the defective product.' " We believe, however, that the California court has focused on the first justification for the product-line exception, specifically, that strict liability is appropriate when the successor's acquisition of the business has virtually destroyed the plaintiff's remedies, to the exclusion of the more dominant themes.

We must first remember that in *Ramirez* the defendant did not cause the destruction of the plaintiff's remedies against the original manufacturer. On the same day that the Court decided *Ramirez*, the Court decided *Nieves, supra*, 86 *N.J.* 361, 431 *A.*2d 826. In that case, an intermediate producer of the product line argued that an essential justification for the imposition of liability was missing, namely, the nonavailability of a functioning manufacturer of the product line. The intermediate manufacturer argued that the first prong of the *Ray* doctrine is concerned solely with finding one viable extant corporate defendant that had succeeded to the *manufacturing* operation and that it was not such a defendant. The Court disagreed. In its view, "the imposition on [the intermediary] of potential liability for injuries . . . is justified as a fair and equitable burden necessarily attached to the substantial benefit that [the intermediary] enjoyed in the 'deliberate, albeit

legitimate, exploitation of [the manufacturer's] established reputation as a going concern producing a specific product line.'" *Nieves, supra,* 86 *N.J.* at 369, 431 *A.*2d 826 (quoting *Ray, supra,* 136 *Cal.Rptr.* 574, 560 *P.*2d at 11). Both the intermediary and the final successor had the ability to assume the original manufacturer's risk-spreading and cost-avoidance roles.

In *Mettinger v. Globe Slicing Machine Co.,* 153 *N.J.* 371, 709 *A.*2d 779 (1998), Justice Pollock revisited the theme of the relative importance of the first prong of the *Ray* doctrine. He explained that the *Ramirez* doctrine rests on deeper premises. "Although a primary justification for the product-line exception is to provide compensation for otherwise remediless victims of a defective product, the imposition of successor liability on corporations also serves the public interest 'of spreading the risk to society at large for the costs of injuries from defective products.'" *Id.* at 383, 709 *A.*2d 779 (quoting *Ramirez, supra,* 86 *N.J.* at 350, 431 *A.*2d 811). Successor manufacturers that have the previous manufacturer's equipment, inventory, records of manufacturing designs, patents, customer lists, and employees have " 'virtually the same capacity as [the original manufacturer] to estimate the risks of claims for injuries from defects in previously manufactured [products] for purposes of obtaining insurance coverage or planning self-insurance.'" *Id.* at 384, 709 *A.*2d 779 (quoting *Ray, supra,* 136 *Cal.Rptr.* 574, 560 *P.*2d at 10). Moreover, "[r]ecourse against a successor corporation is justified 'as a burden necessarily attached to [the successor's] enjoyment of [the original manufacturer's] trade name, good will and the continuation of an established manufacturing enterprise.'" *Ibid.* (quoting *Ramirez, supra,* 86 *N.J.* at 352, 431 *A.*2d 811). Thus in *Wilkerson v. C.O. Porter Machinery Co.,* 237 *N.J.Super.* 282, 291–92, 567 *A.*2d 598 (Law Div.1989),[3] the court ably reasoned,

---

[3] *Wilkerson* involved a products liability claim that arose after the filing of the bankruptcy petition, rather than, as here, a claim arising before the bankruptcy petition was filed.

> Whatever arguments can be made under this justification [of enjoyment of the predecessor-manufacturer's good will] would seem to turn on the nature of the "good will," and the extent to which it was actually "enjoyed by" the successor. It may be argued that a debtor in bankruptcy has less good will than a viable corporate seller, but that raises a fact question that has to be analyzed on a case-by-case basis. It does not warrant the conclusion that a purchase in bankruptcy *per se* precludes successor liability.

In *Ramirez, supra,* 86 *N.J.* at 343, 431 *A.*2d 811, this Court stated that "[t]he form of the corporate transaction" does not control the applicability of successor liability. What is "most important" is the "continuity in the manufacturing of the ... product line throughout the history of these asset acquisitions." *Id.* at 350, 431 *A.*2d 811.

We share the instinctive reaction of those who hesitate to apply the product-line exception to a successor at a bankruptcy sale. At first glance, to apply the doctrine to one who could be contemplating the purchase of assets free and clear of any predecessor liability seems unfair. That concern turns out to be unfounded. In its dealings with plaintiff, Lull III appears to have been represented by remarkably competent counsel. Practice manuals assist attorneys and clients to deal with issues of successor liability, whether they arise in the context of environmental liability, employment discrimination, or, as here, successor products liability. *Cf.* Howard L. Shecter & David W. Pollak, *Successor Liability and Asset Acquisitions: Acquiring or Selling the Privately Held Company,* 947 PLI/Corp 69, 112–18 (1996) (describing practical considerations in preparing for and negotiating purchase or sale of assets to minimize successor environmental liabilities); Steven P. Caley & Therese I. Yard, *Avoid Buying Trouble: Successor Liability for Products Manufactured Prior to Asset Acquisition,* 67 *N.Y.St.B.J.* 30 (1995) (offering advice on structuring asset purchases to lessen likelihood of significant successor liability).

One may fairly assume that a prudent purchaser of assets makes the cost-benefit analysis that renders the acquisition profitable. The *Ramirez* doctrine rests on principles of justice and fairness. "[T]he legal limitation on the scope of [products] liability

is associated with policy—with our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient." James H. Coleman, Jr., *Appellate Advocacy and Decisionmaking in State Appellate Courts in the Twenty–First Century,* 28 *Seton Hall L.Rev.* 1081, 1090 (1998). In New Jersey, "We view the social policy underlying the law of products liability as 'spreading the risk to society at large for the cost of injuries from defective products.' " *Id.* at 1092 (quoting *Ramirez, supra,* 86 *N.J.* at 350, 431 *A.2d* 811).

That our view of successor liability may not enjoy universal or widespread acceptance gives us pause. It is, however, a familiar task for the Court to forge new doctrine. In *Magrine v. Krasnica,* 94 *N.J.Super.* 228, 230–31, 227 *A.2d* 539 (Law Div.1967), *aff'd,* 53 *N.J.* 259, 250 *A.2d* 129 (1969), Judge John F. Lynch observed that "[Dean] Prosser fittingly credits New Jersey with having administered the crucial blow upon the 'citadel of privity' in the historic *Henningsen v. Bloomfield Motors, Inc.* case, 32 *N.J.* 358, 161 *A.2d* 69 (1960)." We seek here to follow the principles of *Henningsen.*

The rules regarding successor liability constitute a court-made area of law. "The four exceptions to the general rule set forth by the *Restatement (Third)* are judicially created exceptions rather than legislatively created exceptions." Cupp, *supra,* 8 *Kan.J.L. & Pub. Pol'y* at 113. For courts to act to correct problems that arise in the area of successor liability is entirely appropriate. In fact, there may be strong reasons not to leave the solution to the Legislature:

> If a single state's legislature acts on its own to create an effective statute that forces a dissolving corporation to set aside funds for long-tail product liability claims, a business incorporated in that state that wishes to dissolve can simply reincorporate in a more lenient jurisdiction, dissolve in that more lenient jurisdiction, and thus avoid having to set aside funds for long-tail claimants. The judicial solution of lessening restrictions on successor liability avoids this "race to the bottom" problem because the law of the jurisdiction in which the plaintiff is injured typically controls in determining a successor's liability. Thus, reincorporating in another jurisdiction generally will not allow a corporation to escape responsibility under a judicial approach.

[*Id.* at 114.]

Ultimately, the question is whether the imposition of a duty on the successor to respond to the complaints of its predecessor's customers is fair, when the successor trades on the loyalty of those customers.[4] Lull today is part of Omniquip International, a publicly-traded corporation that is proud of its heritage and if fully aware of the impact of this litigation might well disapprove of the posture taken here. Lull's parent company has a market capitalization of $149 million, and annual net income of over $25 million. Omniquip proclaims that

> Legrand "Shorty" Lull, a feisty entrepreneur, founded the company that carries his name in 1956. "Shorty" always believed that he knew what contractors required to get their jobs completed faster, and better.... The assets of Lull changed hands several times between the 70's and 80's and in November[ ] 1993, the assets of Lull Corporation were purchased by Badger R. Bazen and Lull Industries was born. Throughout these changes at Lull, one thing never changed[:] customer support and loyalty from the Lull dealer base.

Referring to new product innovations, the message concludes: "Through all of the changes that occurred at Lull over the past years, two things have never changed: Lull's leadership role in the telescopic reach forklift industry, and Lull Quality." *Lull,* (visited Feb. 19, 1999) <http://www.omniquip.com/lull/index.htm>. For some reason, the Lull enterprises decline to maintain products-liability insurance, but it appears that in each re-emergence of the enterprise, Lull has had the same personnel and the same dealers. In reality, a "continuity of enterprise" exists.

---

[4] Because fairness is the guiding principle, we agree that unless the successor's independent action provides a basis therefor, it would be unfair to impose punitive damages on a successor. In order for punitive damages to be appropriate, the successor must be "sufficiently connected to the culpable conduct." *Brotherton v. Celotex Corp.,* 202 *N.J.Super.* 148, 157, 493 *A.2d* 1337 (Law Div.1985) (adopting continuation test to determine successor liability for punitive damages). We also agree that it is wrong to impose successor liability on an asset purchaser that discontinues the product line. *See Saez v. S & S Corrugated Paper Mach. Co.,* 302 *N.J.Super.* 545, 554, 695 *A.2d* 740 (1997) (disapproving *Pacius v. Thermtroll Corp.,* 259 *N.J.Super.* 51, 611 *A.2d* 153 (Law Div.1992), which had held successor company liable for injuries caused by defective product manufactured by predecessor company even when successor did not continue to manufacture product line).

In these circumstances, we do not consider it unfair to impose liability on the successor manufacturers of the Lull forklift. As Justice Pollock explained in *Globe Slicing, supra*, "[r]ecourse against a successor corporation is justified 'as a burden necessarily attached to [the successor's] enjoyment of [the original manufacturer's] trade name, good will and the continuation of an established manufacturing enterprise.'" 153 *N.J.* at 384, 709 *A.*2d 779 (quoting *Ramirez, supra*, 86 *N.J.* at 352, 431 *A.*2d 811). Ready access to counseling such as *The Tire Kicker's Guide to Buying and Selling Assets from Financially Distressed Companies*, 683 *PLI/Comm.* 365 (Feb. 21–22 1994), enabled Lull III to structure the acquisition to avoid or accept successor liability. It should not seek to have it both ways—trading on the good will generated by a long-standing customer base, yet disavowing responsibility to those same customers. Plaintiff has received substantial recovery from other responsible parties such as the distributor and the property owner. Further proceedings would assess Lull's comparative responsibility for the injury.

The judgment of the Appellate Division is affirmed.

POLLOCK, J., dissenting.

With limited exceptions, successor corporations are not liable for harm caused by defective products made or distributed by a predecessor. *Restatement (Third) of Torts* sec. 12 (1997). Contrary to the rule in most jurisdictions, this Court recognizes the "product-line" exception:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.
>
> [*Ramirez v. Amsted Industries, Inc.*, 86 *N.J.* 332, 358, 431 *A.*2d 811 (1981).]

The product-line exception represents our perception of the appropriate balance in the ordinary case between compensating injured parties and the uninhibited transfer of assets. *Mettinger v. Globe Slicing Machine Co.*, 153 *N.J.* 371, 381, 709 *A.*2d 779 (1998).

This appeal questions the weight to be placed in striking that balance when the selling corporation at the time of sale is in bankruptcy. The majority holds that the bankruptcy is of no weight. I believe, however, that when an injury occurs before bankruptcy and the injured party had the opportunity to file a claim in the bankruptcy proceeding, a court should weigh the bankruptcy when striking the balance of interests in the "product line" exception.

To place the matter in perspective, some facts in addition to those set forth in the majority opinion may help. Plaintiff, Justin Lefever, was injured in 1989 in an employment-related accident arising out of the operation of a forklift that had been manufactured by the corporation identified by the majority as "Lull I." Previously, in 1973, Lull I had sold its manufacturing assets to "Lull II," which assumed responsibility for product liability claims such as plaintiff's. Initially, plaintiff sued "Lull Engineering Co., Inc.," for manufacturing and design defects in producing the forklift. Plaintiff also joined as defendants Giles & Ransome, the distributor of the forklift, and K.P. Hovananian Enterprises, the owner of the work site where the accident occurred. Thereafter, plaintiff settled his claims against Giles and Ransome and K.P. Hovananian.

On March 3, 1992, nearly twenty years after acquiring Lull I's assets, Lull II filed a petition for a Chapter 11 bankruptcy. The trustee in bankruptcy promptly notified plaintiff of the bankruptcy, but plaintiff decided not to file a claim. In 1993, Badger R. Bazen (Badger) bought Lull II's assets "free and clear of all interests pursuant to Sections 363(b), 363(f) of the Bankruptcy Code" and with an express disclaimer of any of Lull II's liability for products manufactured or sold before the closing date. The bankruptcy court approved the sale. Also in 1993, Badger sold the assets to the corporation identified by the majority as Lull III.

The bankruptcy court stayed all actions against the debtor. In January 1995, however, the trustee sent plaintiff's counsel a letter stating that the stay did not apply because the present action is

not against the debtor, Lull II. On November 14, 1996, plaintiff joined Lull III as a defendant.

One justification for the product line exception when the original manufacturer no longer exists at the time of the injury is that an injured party may be left without a remedy. *Mettinger, supra,* 153 *N.J.* at 383, 709 *A.*2d 779. When, however, the injured party has recourse against the original manufacturer, that consideration should yield to the unfairness of imposing liability on an innocent successor. The scale could tilt back toward the imposition of liability, if the successor agreed to assume liability in the asset-purchase agreement or if it knowingly participated in a fraudulent asset transfer. Here, the purchaser of Lull II's assets expressly disclaimed liability. Plaintiff, moreover, does not allege that Lull III participated in a fraudulent asset transfer or engaged in a sham transaction.

Significantly, plaintiff had recourse against Lull II, which had assumed contractually the liability of the manufacturer, Lull I. Admittedly, Lull II's bankruptcy could affect the amount paid on plaintiff's claim, but no more so than it would affect the claims of other creditors.

As the Third Circuit Court of Appeals stated, "If a remedy against the original manufacturer was available ... the consumer has not been obliged to bear the risk and the justification for imposing successor liability evaporates." *Conway v. White Trucks,* 885 *F.2d* 90, 95 (1989). To the same effect, the Seventh Circuit Court of Appeals has written:

> Had the [plaintiffs] been parties to the bankruptcy proceeding, they would have had no possible basis for a suit against [the successor] .... because the successor-ship doctrine on which they rely is inapplicable if the plaintiff had a chance to obtain a legal remedy against the predecessor, even so limited a remedy as that afforded by the filing of a claim in bankruptcy. [*Zerand–Bernal, Inc. v. Cox,* 23 *F.3d* 159, 163 (7th Cir.1994) (Posner, J.) ].

The majority suggests that plaintiff should be permitted to proceed with his suit against Lull III because his claim was not "dealt with" in the bankruptcy proceedings. Continuing, the majority remarks that "even if a bankruptcy court were to seek to

'deal' with preconfirmation conduct, at a minimum there probably should be notice to the class of claimants ... and some provision for such claimants should be made under the plan of reorganization." *See ante* at 320–21, 734 *A.2d* at 298. Plaintiff's claim was not "dealt with," however, only because he failed to file a claim in the bankruptcy proceedings, not because he had no notice of the bankruptcy.

The majority opinion limits the power of the bankruptcy court by denying it the power to permit the sale of the debtor's assets free of liability for tort claims. Section 363(f) of the Bankruptcy Code provides, however, that the bankruptcy court shall have the power to sell assets "free and clear of any interest in ... property." 11 *U.S.C.A.* 363(f). Indeed, the sale of Lull II's assets, as approved by the bankruptcy court, so provided. A question remains whether such a sale is free and clear of tort claims that arise after the sale. *Compare In re White Motor Credit*, 75 *B.R.* 944, 950–51 (Bankr.N.D.Ohio 1987) (finding that sale free and clear precluded successor liability for tort claim arising after sale) and *In re Paris Industries*, 132 *B.R.* 504, 510 (D.Maine 1991) (finding that bankruptcy court could enforce sale free and clear by enjoining product liability action) *with Zerand–Bernal v. Cox*, 23 *F.3d* 159, 164 (7th Cir.1994) (finding that bankruptcy court did not have power to enjoin state court product liability action for successor liability on post-sale claim) and *In re Fairchild Aircraft*, 184 *B.R.* 910, 918 (Bankr.W.D.Tex.1995) (holding that sale "free and clear" extinguishes only in rem interests, not in personam liabilities). No case, however, has ever held a successor corporation liable for a tort claim that arose before court approval of the sale.

When a tort occurs before bankruptcy, courts have treated a tort claimant like all other claimants. *Conway v. White Trucks*, 885 *F.2d* 90, 95 (1989); *In re All American of Ashburn, Inc.*, 56 *B.R.* 186, 190 (Bankr.N.D.Ga.1986). In that context, a sale of assets "free and clear" does not result in the imposition of liability on the successor corporation. To impose successor liability would

frustrate "the orderly scheme of the bankruptcy law by allowing some unsecured creditors to recover without regard to the priority order of the bankruptcy proceedings." *Ninth Avenue Remedial Group v. Allis–Chalmers Corp.,* 195 *B.R.* 716 (N.D.Ind.1996); *see also All American, supra,* 56 *B.R.* at 190. A bankruptcy court's authority to sell assets free and clear of existing tort claims is "implicit in the court's general equitable powers and its duty to distribute debtor's assets." *See White Motor Credit, supra,* 75 *B.R.* at 948. The effect of subjecting the successor to the risk of liability is to diminish the value of the assets to the extent of the cost of that risk. That diminution in value will redound to the detriment of all other creditors who seek to participate in the distribution of the bankruptcy estate. Permitting a tort claimant to pursue a successor after a bankruptcy sale would grant that claimant a priority over other claimants who were paid in accordance with the Bankruptcy Code and would produce a negative impact on the trustee's ability to sell assets of the estate at a fair price. *See All American, supra,* 56 *B.R.* at 190. Those considerations should tip the scale back toward the general rule of not imposing liability on a successor when a claimant has been injured before the bankruptcy proceedings and provided with notice and the opportunity to participate in the proceedings. In sum, the imposition of liability on the purchaser of assets from a bankrupt estate "free and clear of any interests in property" skews the balance of interests in the product line exception.

I respectfully dissent. Justices GARIBALDI and COLEMAN join in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, O'HERN and STEIN—4.

*For reversal*—Justices POLLOCK, GARIBALDI and COLEMAN—3.